## In re FECHHEIMER FISHEL CO.

(Circuit Court of Appeals, Second Circuit. February 26, 1914.)

No. 195.

1. CORPORATIONS (§ 470*)—CAPITAL STOCK—"PREFERRED STOCK"—"BOND."

So-called debenture bonds issued by a corporation to its organizers, providing that they should be subordinate to the claims of general business creditors, that upon liquidation or dissolution or final distribution of the assets such creditors should be entitled to priority of payment in full

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

over the bonds, that the bonds should bear interest payable out of the earnings before any dividends should be set apart or paid on the stock and which should be cumulative, and that upon liquidation or dissolution or final distribution of the assets the bonds after payment of debts should be entitled to the whole residue of the company's assets, were in effect preferred stock, since the distinguishing feature of a bond is an obligation to pay a fixed sum of money with stated interest while the distinguishing feature of stock is a part ownership of the assets and a right to participate in the management and share in the surplus profits and in the surplus assets upon dissolution.

[Ed. Note.—For. other cases, see Corporations, Dec. Dig. § 470.*

For other definitions, see Words and Phrases, vol. 6, p. 5500; vol. 1, pp. 830–834; vol. 8, p. .7592.]

2. CORPORATIONS (§ 565*)—CAPITAL STOCK—REDUCTION—PURCHASE OF OWN STOCK.

Under Penal Law N. Y. (Consol. Laws, c. 40) § 664, subd. 5, providing that a director of a corporation concurring in any vote or act by which it is intended to apply any portion of the funds of the corporation except surplus profits to the purchase of its own stock is guilty of a misdemeanor, a note given in New York by a New York corporation engaged in business in that state in payment of its own stock, though given in good faith and at a time when the company was solvent, was unenforceable as against creditors where the corporation was insolvent at maturity; the note being in effect a promise to pay out of surplus profits if payment could be made without prejudice to creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2281, 2282; Dec. Dig. § 565.*

Right of corporation to retire or reduce its own stock, see note to Allen v. Francisco Sugar Co., 114 C. C. A. 469.]

3. CORPORATIONS (§ 544*)—INSOLVENCY—ASSETS AS TRUST FUND.

The assets of an insolvent corporation are subject to a trust for the benefit of its creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2162–2169; Dec. Dig. § 544.*]

4. CORPORATIONS (§ 566*)—CAPITAL STOCK—REDUCTION—PURCHASE OF OWN STOCK.

Where a so-called debenture bond issued by a corporation to one of its organizers and officers, which had the characteristic features of preferred stock, but which had a definite due date, was surrendered to the corporation in exchange for a note afterwards renewed, but was never canceled, and its surrender was apparently to evade the provision thereof making it subordinate to the claims of general business creditors, the rights of creditors to priority upon the subsequent insolvency of the corporation did not depend upon whether they became creditors before or after the maturity of the bond or of the original note; no part of the capital stock having been withdrawn, and the creditors having given credit on the strength of the unreduced capital.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2283–2286; Dec. Dig. § 566.*]

5. PARTNERSHIP (§ 42*)—ORGANIZERS OF CORPORATION—EFFECT OF AGREEMENT.

An agreement between the organizers of a corporation, limiting their right to sell their stock and bonds to a sale to the other members, and providing that if the other members did not wish to purchase the corporation should be dissolved and liquidated, did not destroy its character as a corporation or make it a partnership.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 57; Dec. Dig. § 42.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the Fechheimer Fishel Company, bankrupt. From an order confirming an order of the. referee postponing the payment of any dividend upon the claim of the estate of Bernard Rothenberg, deceased, until after the claims of general creditors had been paid in full, Albert Dellevie, as sole surviving executor, appeals. Affirmed.

The Fechheimer Fishel Company is a corporation organized under the laws of the state of New York and doing business in the city of New York. Its capital stock was fixed at $550,000, divided into 5,500 shares of the par value of $100 per share, and of this amount all but $20,000 was issued. In addition debenture bonds aggregating $550,000 were authorized, all of which were issued except $20,000 retained in the treasury of the corporation for future use. The bonds and stocks were issued to the organizers of the corporation, each of whom held, dollar for dollar, equal amounts of bonds and of stock.

By agreement, made part of the bonds, it was provided that "bonds" and stock should be inseparable and that on any sale of "bonds" an equal amount of stock should go with them. The right to sell or dispose of the bonds and stock held .by any member of the corporation was limited to a sale to the other. members in the manner provided by the agreement, and it was required that on the retirement of any member, for any reason, his bonds and stock should be sold to the other members at the book value of the bonds or else that the corporation should be dissolved and liquidated.

On November 1, 1909, Bernard Rothenberg was the holder of a "bond" of the Fechheimer Fishel Company for $50,000 and a like amount of its stock and was also treasurer of the company. On that date he indorsed. in blank and delivered to the company the "bond" and the certificate for the stock and received from the company a note for $50,000, dated November 1, 1909, payable two years after date, with interest at 6 per cent. per annum, payable semiannually. He also received an agreement by the company to pay him an additional 2 per cent. per annum so as to make the interest on the note equal to the interest on the bond. This agreement was not actually dated or delivered until January, 1910, but was apparently part of the same transaction in which the note was given. This note was entered by Rothenberg himself in the company's bills payable book, but on the last page, and not where such an entry would naturally appear. The bond and stock were put, in an envelope marked with Rothenberg's name, in the company's safe. The bond was never canceled in the manner customary when bonds were surrendered. On August 9, 1911, this note was renewed by a new note for the same amount, payable November 1, 1912, accompanied by a similar agreement for the .payment of additional interest. This is the note on which the claim is made. The Fechheimer Fishel Company was adjudicated bankrupt.

It was contended by the trustees in bankruptcy and held by the referee and by the court below:

First, that the so-called "bonds" were in reality merely a form of preferred stock and as such subject to the general rules of law applicable to a corporation's purchase of its own stock.

Second, that the corporation had no right to buy its own stock unless it was possessed of net profits sufficient to pay therefor without diminishing the fund upon which creditors had a right to rely.

Third, that the claimant was bound by the terms of the "bond" or stock and could not receive any payment in advance of general creditors.

Colby & Goldbeck, of New York City (Edward D. Brown, of New York City, of counsel), for appellant.

Louis F. Doyle and Joseph M. Proskauer, both of New York City, for trustees in bankruptcy.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). [1] It is necessary in the first place to determine the real nature of the so-called "debenture bonds" which this corporation issued. The courts have determined that the fact that an instrument is called a "bond" is not conclusive as to its character. It is necessary to disregard nomenclature and look to the substance of the thing itself. The distinguishing feature of a bond is that it is an obligation to pay a fixed sum of money with stated interest. The distinguishing feature of stock is that it confers upon its holder a part ownership of the assets of the corporation and gives him a right to participate in the management of the corporation and to share in the surplus profits and on dissolution to share in the assets which remain after the debts are paid.

The "debenture bonds" involved in this case provide on their face as follows:

"This bond is issued subject to and with the benefit of the terms and conditions endorsed thereon, which are deemed part of it."

Among the conditions so indorsed on the bonds was the following:

"All the bonds of said series A are to be subordinate to the claims of the general business creditors of said company, and upon liquidation or dissolution of said company or upon the final distribution of its assets, such creditors shall be entitled to priority of payment in full over said bonds."

Another condition indorsed on the bonds provides that the said debenture bond shall be entitled to receive out of the earnings interest at the rate of 8 per cent. per annum before any dividend shall be set apart or paid on the stock of the company, and that such interest shall be cumulative. It is also provided that, upon the liquidation or dissolution of the company's business or the final distribution of its assets, the said debenture bonds shall after payment of the debts of the company be entitled to the whole residue of the company's assets. All these features are quite characteristic of stock. They are not at all characteristic of bonds. And we are satisfied that no error was committed by the court below in holding that these so-called "bonds" were in effect preferred stock. Burt v. Rattle, 31 Ohio St. 116; Hilson Co. v. State Board of Assessors, 82 N. J. Law, 2, 80 Atl. 929; Cass v. Realty Securities Co., 148 App. Div. 96, 132 N. Y. Supp. 1074, affirmed 206 N. Y. 649, 99 N. E. 1105.

The bond for $50,000 which Rothenberg surrendered to the company on November 1, 1909, being in effect preferred stock of the company, the transaction was therefore a purchase by the company of its own stock and payment therefor by the issue of its own note, which, after renewal, matured when the company was insolvent. We are thus led to inquire whether the company had the right to purchase the stock and, if so, under what conditions.

The courts are not at all agreed concerning the right of a corporation to purchase its own stock.

The view that a corporation cannot buy its own stock without an express grant is based on the following grounds:

1. That corporations cannot increase or diminish their capital stock without the sanction of the Legislature.

2. That such a transaction is a fraud upon creditors.

3. That it is foreign to the purposes for which the corporation was created.

In England the courts, in a long and unbroken line of decisions, have held that a corporation, unless expressly authorized to do so, cannot purchase its own stock. The leading case in that country upon the subject was decided in the House of Lords in 1887, Trevor v. Whitworth, L. R. 12 App. Cas. 409.

In the United States the courts of some of the states have followed the English rule. But the clear weight of authority upholds the right of a corporation to buy its own stock if the purchase is made in good faith and does not prejudice the rights of creditors. Cook on Corporations, vol. 1 (7th Ed.) § 311.

The text-writers have arrayed themselves generally on the side of the English rule. Thompson on Corporations says, in volume 2, § 2054:

"The rule which forbids a corporation thus to employ its funds rises to the grade of a rule of public policy; and is so strong that although power is conferred upon the company to deal in the shares of joint-stock companies generally, this does not authorize it to deal in its own shares."

### Machen on Modern Law of Corporations says, in volume 1, § 628:

"In America, many courts uphold the same sound and wholesome doctrine as the English cases. But it must be conceded that a somewhat larger number of the American courts have taken the view that a corporation may without express statutory authority purchase its own shares, provided. the purchase is entered into bona fide and does not endanger the claims of creditors. It should be observed that the American cases which agree with the English doctrine are often well considered and fully reasoned, whereas those which uphold the contrary view generally lack any extended examination of the subject."

### Mr. Morawetz, in his work, says in volume 1, § 112:

"No verbiage can disguise the fact that a purchase by a corporation of shares in itself really amounts to a reduction of the company's assets, and that the shares purchased do in fact remain extinguished, at least until the reissue has taken place. The fact that such a transaction may not necessarily be injurious to any person is not a sufficient reason for supporting it. It is contrary to the fundamental agreement of the shareholders, and is condemned by the plainest dictates of sound policy. To allow the directors to exercise such a power would be a frightful source of unfairness, mismanagement, and corruption. It is for these reasons that a shareholder cannot be allowed to withdraw from a corporation with his proportionate amount of capital, either by a release and cancellation before the shares have been paid up, or by a purchase of the shares with the company's funds."

We have referred to the opinions of these writers because we think that, in recognizing the right of a corporation to buy its own stock, they indicate the necessity of confining the right to purchase within strict limits. Indeed, the dangers incident to the recognition of the right has led the Legislatures in a number of the states to prohibit the right altogether. And Congress in enacting the law relating to national banks has denied to such banks any right to purchase their own stock.

[2] The corporation which purchased its stock in the case at bar was organized under the laws of New York, was engaged in business in New York, and entered into the purchase of the stock in New

York. And under the law of New York a corporation has the right to purchase its own stock. City Bank of Columbus v. Bruce, 17 N. Y. 507 (1858); Vail v. Hamilton, 85 N. Y. 453, 457 (1881); Joseph v. Raff, 82 App. Div. 47, 54, 81 N. Y. Supp. 546, affirmed 176 N. Y. 611, 68 N. E. 1118. But the purchase must be made out of surplus profits and cannot be made from the capital. The Penal Law of the state provides, in section 664, that:

"A director of a stock corporation, who concurs in any vote or act of the directors of such corporation, or any of them, by which it is intended: * * * (5) To apply any portion of the funds of such corporation, except surplus profits, directly or indirectly, to the purchase of shares of its own stock—is guilty of a misdemeanor."

In Richards v. Wiener Co., 207 N. Y. 59, 65, 100 N. E. 592, 593 (1912), the Court of Appeals, in speaking of an agreement by the corporation to purchase its own stock, said:

"The contract itself, therefore, was perfectly legal subject to certain limitations upon its enforceability. If when the time came defendant had a sufficient surplus, the contract would be enforced. If it had not, the contract could not be enforced."

But the contract in that case involved an agreement by the corporation to purchase its stock on a certain contingency. The agreement was made with one who had bought his stock on the corporation's promise to employ him in its business, with the right reserved to discontinue his employment at its option, and, in case of a discontinuance, the corporation bound itself to repurchase his stock if he so desired. What the court held was that the agreement was not invalid, but that its enforceability depended upon whether "when the time came" it had a sufficient surplus. In that case the time for the payment for the stock would be concurrent with the seller's exercise of his option to sell. But this is not decisive of the case at bar. In the case before us the time for the payment of the stock was not concurrent with the purchase but was postponed for two years and then again postponed for an additional year. Assuming that the corporation was solvent when the stock was purchased and that the contract was therefore valid at that time, the question we have to decide is as to the effect of the subsequent insolvency of the corporation upon this obligation of the company to pay for the stock. We are not aware that the New York courts have dealt with that question, and we must decide it upon principle with the aid of such light as the decided cases throw upon it.

The courts have decided in numerous cases that a corporation cannot buy its own stock if at the time it is insolvent. Tiger Bros. v. Rogers, etc., Co., 96 Ark. 1, 130 S. W. 585, 30 L. R. A. (N. S.) 694, Ann. Cas. 1912B, 488 (1910); Currier v. Lebanon Slate Co., 56 N. H. 262 (1875); Alexander v. Relfe, 74 Mo. 495 (1881); Hall & Farley v. Alabama, etc., Co., 173 Ala. 398, 56 South. 235 (1911).

There is no evidence in this case that, at the time the agreement was made to buy Rothenberg's stock, the company was insolvent. But we are not by any means to understand that a corporation has a right to buy its own stock simply because it is solvent at the time, because

if it becomes insolvent thereafter and before payment has been made, or if it is made insolvent by the transaction, the payment cannot be made, for the Penal Law of the state makes it a crime to apply anything but "surplus profits" to the purchase of the stock, and there are no such profits which can be applied.

In Fitzpatrick v. McGregor (1909) 133 Ga. 332, 340, 65 S. E. 859, 862 (25 L. R. A. [N. S.] 50), the court declares that the creditors of the corporation can question the purchase "when the circumstances are such as to show that the transaction was fraudulent in fact, or that the corporation was insolvent, or in process or contemplation of dissolution at the time the purchase or exchange was made, and also that the transaction diminished their (the creditors') security for the debts due them."

The courts also recognize the right of a corporation to take its own stock in payment of a security for antecedent debts when it is necessary to do so. Cook on Corporations (7th Ed.) § 892.

But there is no evidence in this case that Rothenberg was indebted to the company at the time this purchase of the stock took place, or that he was insolvent at that time or at any other time, or that the stock was taken in payment of an antecedent debt. On the contrary, in the case at bar the corporation bought the stock outright and gave its note in payment therefor.

The note for $50,000 due November 1, 1912, which is the basis of the claim involved in this case is a renewal of a note for the same amount given by the bankrupt on November 1, 1909. Whatever infirmity inhered in the original note attached to the renewal note. Hamor v. Taylor-Rice Engineering Co. (C. C.) 84 Fed. 392, 398 (1897). As the note was given by the corporation for its own stock, the right to enforce payment out of the assets of the corporation depends upon the existence of surplus profits.

If at the time the stockholder receives payment for his stock the payment prejudices the creditors, payment cannot be enforced. If a stockholder sells his stock to a corporation which issued it, he sells at his peril and assumes the risk of the consummation of the transaction without encroachment upon the funds which belong to the corporation in trust for the payment of its creditors.

The right of the creditors of the corporation cannot be defeated by the fact that at the time the transaction was entered into the seller of the stock and the officers of the company who purchased it were acting in good faith and supposed that the company was solvent.

The Supreme Court of Illinois in Commercial National Bank v. Burch, 141 Ill. 519, 31 N. E. 420, 33 Am. St. Rep. 331, said:

"Purchase of its own stock by a corporation by the exchange of its property of equal value, though made in good faith and without any element of fraud," or "anything in the apparent condition of the" corporation "to interfere with the making of the exchange, will not be allowed where it injuriously affects a creditor of the" corporation, "even though the fact of the indebtedness was not at the time established or known to the stockholders. * * * The capital stock of" a corporation "is a fund set apart for the payment of its debts, and the directors * * * hold it in trust for that purpose. * * * The shareholders of the corporation are conclusively charged with notice of the trust character which attaches to its capital stock.

As to it they cannot occupy the status of innocent purchasers," and, when "they have in their hands any of the trust fund, they hold it cum onere, subject to all equities which attach to it."

In Clapp v. Peterson, 104 Ill. 26 (1882), the same court, after stating that the shareholders of a corporation are conclusively charged with notice of the trust character which attaches to its capital stock and that when they have any of this trust fund in their hands they hold it cum onere, subject to all the equities which attach to it, went on to say:

"It is objected, against the principles above stated, that the cases in which they were declared were where there was actual or constructive fraud or unfairness, where the corporations were insolvent, or in process of being wound up. The question naturally would arise mostly in such circumstances, but the principles enunciated are general in scope, following from the nature of the capital stock of corporations, and the relation of a stockholder to the corporation, and we know of no limitation of their application as above suggested."

In this statement we fully concur. There can be no such limitation of the principle.

The Supreme Court of Connecticut, in Crandall v. Lincoln, 52 Conn. 73, 52 Am. Rep. 560 (1884) said:

"If the view we have taken of the character and nature of this stock is sound," that it is a trust fund for the security of creditors, "and we have no doubt that it is, the conclusion inevitably follows that under no circumstances can a stockholder sell his stock to the company and take therefor his portion of the capital stock to the prejudice of creditors. The illegality of the transaction does not at all depend upon the actual knowledge or mala fides of the seller; if he in fact sells to the company and receives in return a part of the capital, the policy of the law requires him to know it, and conclusively charges him with knowledge. Thus selling, he sells at his peril. In no other way can the rights of creditors be protected. The seller can protect himself by selling to other parties, or he may hold his stock, taking, as he is bound to, the risk of his investment. The creditor is not bound to assume any part of the stockholder's risk, and he has no way of protecting himself. The law is his only protection."

The above cases were not based on any local statute, but upon general principles.

[3] In saying that the assets of a corporation constitute a trust fund, we are to be understood as referring to the assets of an insolvent corporation. A solvent corporation, of course, holds its property as any individual holds his. But when a corporation becomes insolvent, a trust arises in respect to the administration of its assets for the benefit of its creditors. Hollins v. Brierfield, etc., Co., 150 U. S. 371, 381, 383, 14 Sup. Ct. 127, 37 L. Ed. 1113 (1893); McDonald v. Williams, 174 U. S. 397, 401, 19 Sup. Ct. 743, 43 L. Ed. 1022 (1899). Hence when a corporation buys its own stock payment cannot be made with funds which upon insolvency belong to its creditors instead of to its stockholders. Cook on Corporations (7th Ed.) vol. 1, § 9, pp. 42, 43.

In Clark v. E. C. Clark Machine Co., 151 Mich. 416, 115 N. W. 416 (1908), a corporation purchased some of its own stock for which it gave three promissory notes in payment secured by a chattel mortgage. The corporation at the time it made the purchase owed somewhere within $300. The assets of the corporation were worth about

$9,000. The stockholders had all agreed to the purchase and, if there were any creditors existing at the time of the purchase, none of them complained. All the creditors who did complain were subsequent creditors who gave credit with the mortgage · on file in the proper office, but who insisted that it was not notice to them that the assets of the company had been used to purchase some of the capital stock. The court said that the assets of a corporation constituted a trust fund not only for the benefit of existing but also for future creditors, and that they could not be used in the purchase of outstanding stock to the exclusion of subsequent creditors. It added:

"It is apparent under the record as it now stands that the assets will be more than sufficient to pay the debts. Should this prove to be · the case Mr. Wells (whose stock the company purchased) will be entitled to receive out of the surplus sufficient to pay this amount. The decree will be modified in accordance with this opinion."

In other words, the right of the vendor of the stock to receive payment on the notes given him by the corporation for his stock was not conclusively established by the fact that the corporation was solvent when the purchase was made. His right turned on the condition of the assets at the time payment was to be made and he could only be paid out of the surplus if any there should be.

The Supreme Court of Michigan, in 1906, in McIntyre v. Bement's Sons, 146 Mich. 74, 109 N. W. 45, 10 Ann. Cas. 143, held that an agreement by a corporation to take back its stock at cost at the expiration of two years if the purchaser so wished became void on the corporation's becoming insolvent at or before the purchaser sought to exercise his option. It was claimed in that case that, if the promise when given was valid, subsequent insolvency of the maker would not make it invalid. The court admitted that this would be true as respects the usual and ordinary contracts of corporations and individuals, but held that this principle did not apply to contracts made by a corporation for the purchase of its stock.

The stock of a corporation is its only basis of credit, and it is of vital importance that it be rigidly guarded and protected. Courts have conceived it to be their duty to detect and defeat any scheme or device calculated in any way to place this fund beyond the reach of the creditors. Buck, Trustee, v. Ross, 68 Conn. 29, 31, 35 Atl. 763, 57 Am. St. Rep. 60 (1896). As the illegality of a purchase by a corporation of its stock rests upon the fact that it withdraws assets upon which the creditors have a superior right or lien, it seems to us that even though the company may have been solvent when the contract to purchase was made, if it becomes insolvent later or is made insolvent by the transaction and is in that condition at the time when payment is to be made, the vendor' cannot as against creditors be permitted to take the assets for that purpose in a state in which the statutes make it a criminal offense to apply directly or indirectly anything but surplus profits to the purchase by a corporation of its own stock. If the stockholder postpones the time of payment, he runs the risk of the corporation becoming insolvent in the meantime and must be held to a knowledge of the fact that he cannot enforce payment if in doing so

he deprives the creditors of assets upon which they have a lien superior to any claim of his. In the case at bar, when the corporation bought the stock and gave its note to Rothenberg, it in effect promised to pay him $50,000 out of surplus profits and if payment could be made without prejudice to creditors. To be sure the note did not so state on its face, but that was a condition which the law attached to it and which was binding on both Rothenberg and the company. The fact that the corporation had a surplus when the note was given is not decisive of the case if it was insolvent when the time for payment arrived. What the rule may be in the absence of such a statutory provision as exists in New York we need not now determine.

[4] The bond was a promise to pay Rothenberg "and any subsequent registered holder" $50,000 on November 1, 1904. Payment was thereafter extended to November 1, 1910. Before that time arrived and on November 1, 1909, Rothenberg surrendered the bond and accepted a note for $50,000, and it was agreed that he should have the same interest on the note that he was to receive on the bond. That note was payable in two years, but before the time for payment came a new note was given, dated August 25, 1911, payable November 1, 1912, which was similar in amount to the bond both as to principal and interest. Assuming that the bond was nothing more than preferred stock, it is necessary to consider whether the fact that it had a definite due date affords any sufficient reason for distinguishing it from stock not so limited in time, and making it necessary to hold that all who became creditors after the due date, or after the date of the first note or the date of the renewal note should be held to have no claim superior to Rothenberg's upon the assets of the corporation. We do not think that under the facts of this case we can make any such distinction. The manner in which this corporation sought to conduct its business was extraordinary and altogether unusual. The trustees charge that the arrangement by which the bond was surrendered and the note issued in lieu thereof was devised and executed for the purpose of evading and defeating the provision of the bond which recited that it was to be "subordinate to the claims of the general business creditors of said company, and upon liquidation or dissolution of said company, or upon the final distribution of its assets, such creditors shall be entitled to priority of payment in full over said bonds." Whatever may have been the reasons which influenced Rothenberg and the company in their dealings with each other, we are satisfied that, if we should construe the note as counsel for Rothenberg ask us to construe it, the effect certainly would be to prejudice the rights of the creditors, in disregard of the New York statute. The surrender of the bond which the company seems never to have canceled and the giving of the note did not in itself work any reduction in the amount of the capital for neither were ever paid, and the $50,000 remained in the business being at no time withdrawn. The due date of the bond and the due date of the note are alike immaterial under the circumstances of the case. At the best they only indicated a time when a reduction of the capital stock might have been made under the agreement, but, as the reduction was not made, it may be disregarded. There is a well-estab-

lished principle to the effect that if an individual, even without any intention to defraud creditors, disposes of his property without consideration, those who subsequently become creditors cannot complain or ask to have the transfer set aside, so that they can reach the property and apply it to the payment of their debts. The reason is they have not been injured or prejudiced in their rights as they gave credit to the debtor in the condition he was in after the transfer was made. The courts have applied the same principle to the creditors of corporations. Graham v. La Crosse & Milwaukee R. Co., 102 U. S. 148, 26 L. Ed. 106. In the case at bar no part of the capital had been withdrawn and paid over to Rothenberg and the creditors gave credit to the corporation on the strength of its unreduced capital. And if, at any time after any one of these creditors gave credit on the strength of its capital, any part of that capital as distinguished from its surplus had been paid over to Rothenberg, such creditor might have maintained a suit in equity against him to recover from him and subject to the payment of his claim any part of the capital which Rothenberg so received. Guiness v. Land Corporation of Ireland, 22 Ch. Div. 349, 375 (1882); Wood v. Dummer, 3 Mason, 308, Fed. Cas. No. 17,944 (1824); Buck v. Ross, 68 Conn. 29, 35 Atl. 763, 57 Am. St. Rep. 60 (1896); Bartlett v. Drew, 57 N. Y. 587 (1874); Singer v. Hutchinson, 183 Ill. 606, 56 N. E. 388, 75 Am. St. Rep. 133 (1900).

The court below in its decision stated that "the bankrupt corporation was really a copartnership masquerading as a corporation." The court added:

"Reduced to its lowest terms, what Rothenberg did was to convert his partnership interest into a debt of the concern, without liquidation. If he can do this, all other bondholders could have done the same thing. So that, if this claim is good, every debenture might have been converted into a note; the consideration being in each case forbearance from enforced liquidation. This seems to me reductio ad absurdum."

[5] In confirming the order which the court below made, we disclaim any intention of treating this corporation as a partnership. The provision by which the corporators agreed that their right to sell their stocks and bonds should be limited to a sale to the other members of the corporation and that, if they did not wish to purchase, then the corporation should be dissolved and liquidated, did not destroy its character as a corporation.

If this corporation is not a corporation in law but is to be regarded as a partnership, there can be no reason, of course, why the other partners could not have bought out Rothenberg's interest. In that event the purchase of his interest would work a dissolution and a winding up of the partnership; in which case the creditors would be paid before the partners.

But it was as we have said, not a partnership, and it is not to be treated as one. There is no real analogy between a partnership and a corporation, as is clearly pointed out in a case decided in the House of Lords. Birch v. Cropper, L. R. 14 App. Cas. 525.

The order of the referee was confirmed by the court below, and it postponed the payment of dividends out of the bankrupt's estate on

the claim of Rothenberg's executor for the sum of $50,925 until after the claims of general creditors of the bankrupt have been paid in full.

The order of the court below is affirmed.