SCHWEMER, Receiver, Appellant, vs. FRY, Respondent.

*May 10—June 6, 1933.*

For the appellant there was a brief by *Alexander, Burke & Clark,* attorneys, and *Frank P. Burke* and *Giles F. Clark* of counsel; *Miller, Mack & Fairchild,* attorneys, and *Paul Newcomb* of counsel; and *Swietlik & Burns,* attorneys, and *George A. Burns* of counsel, all of Milwaukee, and oral argument by *Mr. Burke.*

For the respondent there was a brief by *Fawsett & Shea,* attorneys, and *Charles F. Fawsett* and *C. F. Mikkelson* of counsel, all of Milwaukee, and oral argument by *Mr. Fawsett.*

FAIRCHILD, J.   Were respondent's subscriptions for stock in the American Founders Securities Company legally canceled by the action of the stockholders at their meeting October 25, 1928? It appears from the evidence that none of the present creditors were creditors at the time of the cancellation of those agreements and that the corporation at the time was solvent.  So the case resolves itself into a question of whether the receiver representing the corporation has a claim of any nature arising out of the stock subscriptions against the respondent.

In the fall of 1928 the corporation was experiencing some difficulty.   There were unissued, because unpaid for, under respondent's subscription contracts, 9,962 shares of the capital stock of the company.   The right or license to sell the corporation's stock had been revoked by the Railroad Commission, resulting in respondent's inability to make further sales of stock.   The evidence shows this act of the Railroad Commission rendered Fry unable to pay and re-

sulted in making the subscription contracts practically worthless so far as the corporation was concerned.

The nature and contents of the subscription agreements are important. The terms used in the contracts set out in the statement of facts carry an ambiguity which, so far as the parties to it are concerned, permit the use of parol testimony of facts and circumstances surrounding the making of the contract for the purpose of clarifying doubtful phrases and setting forth just what in fact the writing was intended to express. The contract cannot be altered or varied but may be made clear as to the manner of its execution as it was understood to be applied to the subject matter. *Hammond v. Capital City Mutual Fire Ins. Co.* 151 Wis. 62, 138 N. W. 92. The corporation knew that the license to sell its stock had been revoked by the Railroad Commission and that the sales feature was an essential part of Fry's contract. The net assets of the corporation, exclusive of stock liability, amounted to the sum of $317,000 and it was a solvent going concern. But under the existing set-up the company was operating with a capital deficit. This among other things prevented declaring dividends. Moved by Fry's contentions and this unsatisfactory and indefinite situation, the directors recommended a reorganization to the stockholders, and at a meeting held October 25, 1928, the stockholders accepted the recommendations of the directors. These recommendations were: (1) cancellation of Fry's unpaid subscriptions; (2) reduction of the corporation's authorized capital stock; (3) adjustment of the valuation of the stock so as to permit future earnings to be made available for distribution as dividends. The books of the corporation were accordingly changed and three dividends were declared during the years 1929 and 1930. These dividends were paid to and received by the stockholders.

Appellant raises the question as to whether a quorum was present at the stockholders' meeting at which the recom-

mendations just mentioned were adopted. There were 5,706 shares of stock issued and paid for at the time. It is the claim of appellant that at least 8,001 shares were required to constitute a quorum because the authorized capital of the company at the time the meeting was called was 16,000 shares. The subscription contracts under consideration at the time of the meeting in October, 1928, the company having held itself out as fully organized, might very readily have had a more binding effect upon the respondent than he intended they should have if the rights of creditors were involved, but in the situation presented to us creditors are not concerned.

In the absence of express charter or statutory provision the general rule is that only legal owners of shares in a stock corporation have a right to be present and vote in the corporate meetings. The right to vote is inseparable from the right of ownership of stock. This corporation did have provision for 16,000 shares of stock. At most it can only be said of it that twenty per cent. of the stock had been paid in and that more than fifty per cent. had been subscribed for. There is no evidence of claim on the part of the respondent that he had a right to vote more than the shares for which he had actually paid. So, as suggested, 5,706 shares of stock comprised the whole of the then issued and legally owned stock. We must find the quorum in the stock issued. At any meeting of a stock corporation a quorum is present when members owning a majority of the stock are present or represented except when otherwise specially provided by law or by articles of organization. Sec. 182.02, Stats. And sec. 182.06 provides:

"'No corporation shall issue any stock other than dividend stock, except in consideration of money or of labor or property estimated at its true money value, actually received by it, . .... and all stocks and bonds issued contrary to the provisions of law . . . shall be void."

Of the 5,706 shares of stock issued, 4,356 were represented at the meeting of October 25, 1928. If the interpretation of sec. 182.02 contended for by appellant is accepted, one situated as respondent was could vote all the stock he had subscribed for, and while refraining from paying for it still have control of the affairs of the corporation. We agree with the contention of respondent that capital stock is the amount of stock that a corporation may issue and that voting power of a corporation is confined to the stock issued in accordance with the statutes. This appears to be the intention of the legislature not only because of the situations which might arise were any other meaning to be read into the statutes, but because of the phraseology used throughout the chapter on corporations, where voting rights are referred to, such as in sec. 180.07, where the language used is:

"Any corporation organized for any of the purposes authorized by this chapter, may, by a vote of two-thirds of all the stock outstanding, and entitled to vote, . . . amend its articles so as to modify or enlarge its business . . . or increase or diminish its capital stock."

We think the cases of *Hill v. Town,* 172 Mich. 508, 138 N. W. 334, 42 L. R. A. n. s. 799, and *Orloff v. Stott,* 239 Mich. 563, 215 N. W. 1, support this interpretation, as does *Foote v. Greilick,* 166 Mich. 636, 132 N. W. 473. In *Greenpoint Sugar Co. v. Whitin,* 69 N. Y. 328, the court considered a statute requiring the written assent of stockholders owning at least two-thirds of the capital stock of the corporation to the execution of a mortgage, and said: "For the purposes of this act we think that the amount actually issued and owned should be regarded as the amount of the capital stock."

Subscribers for stock are sometimes referred to as stockholders, but it would lead to unusual difficulties and unnecessary complications were it provided that subscribed and un-

subscribed stock must be considered in determining a quorum. The same difficulties arise unless a distinction is made between issued and unissued stock. The plain language of the statute, when given its natural significance as applied to this situation, means that a quorum was present and represented by the 4,356 shares out of the total of 5,706 issued and outstanding.

In the absence of the interests of creditors the question becomes narrowed to a problem wholly that of the corporation and of the subscribers to its stock. Three or more adult residents of this state may form a corporation by subscribing to articles, but until the required amount of the capital stock is subscribed for and paid in they are prohibited from doing business as a corporation. The first meeting may be held at any time after one-half of the capital stock shall have been subscribed and one-fifth of its authorized capital actually paid in; or, as in this case, the stock being without par value, the corporation could transact no business with any others than its members until at least one-half of the number of authorized shares had been subscribed and one-fifth of the number of authorized shares actually paid in. If the agreement between the subscribers and respondent was such as to advise all concerned that there was not a *bona fide* subscription, then, as between themselves, they were acting merely as subscribers and organizers. The signers of the articles may abandon the organization, revoke the articles or amend the same by amendment to the original articles of organization, filing and recording the same in the same manner that articles and copies are required to be filed and recorded. Sec. 180.06 (4), Stats. The cancellation of a stock subscription has so many of the same characteristics of a purchase of its own shares of stock by a corporation that we may look into the cases of that character for analogies. *In re Fechheimer Fishal Co.* 212 Fed. 357. In 1 Cook on Corporations (8th

ed.) § 168, it is said: "The cancellation of a subscription differs little from a purchase by the corporation of shares of its own stock."

In 7 Ruling Case Law, p. 199, § 169, it is said:

"The doctrine that unpaid subscriptions to the capital stock are a trust fund for creditors has no application until the corporation becomes insolvent." *Marvin v. Anderson,* 111 Wis. 387, 87 N. W. 226.

There appears to be no reason for preventing a corporation purchasing its own shares of stock if such purchase does not render the corporation insolvent. *Rasmussen v. Schweizer,* 194 Wis. 362, 216 N. W. 481; *Koeppler v. Crocker Chair Co.* 200 Wis. 476, 228 N. W. 130; 2 Fletcher, Encyc. Corp. § 641.

All of the subscribers to stock of the corporation acquiesced in and consented to the cancellation of October 25, 1928. Immediately after the adoption of the cancellation resolution the capital stock was reduced by unanimous vote. This ended the existence of the contract by making impossible of operation respondent's subscription agreement, and made it impossible for the corporation to comply with any stock subscription agreement that required the issue of more than 7,500 shares. The authorized capital stock of the corporation was then 7,500 shares and it has remained so ever since. Business thereafter was done on the basis of the reduced capital and with the understanding that the subscription agreements of respondent had been canceled. The books were changed to conform to the stockholders' action, and upon the readjusted values dividends were declared and paid with the approval and consent of all the stockholders. Operating under these conditions for upwards of three years, the subscribers or stockholders precluded themselves from questioning the validity of the release of respondent from the obligation on his contract of subscription.

The wording of the subscription contracts shows that it was understood respondent could perform his part only by making sales of the stock. It appears that at the time of the cancellation respondent claimed that the subscription agreement was conditioned on his ability to resell the stock and there was no serious dispute of that claim. As said in 2 Fletcher, Encyc. Corp. § 640:

"Nor does the general rule apply when there is a *bona fide* dispute as to liability on a subscription. In such a case, the corporation, if the transaction is in good faith, may compromise the dispute, accepting a surrender of his shares from the subscriber and releasing him from further liability."

There are no rights of creditors involved in this case so far as the subscription agreements are concerned. And the receiver, therefore, has no greater rights against respondent than the corporation had at that time they were canceled. *Gilman v. Gross,* 97 Wis. 224, 72 N. W. 885, holds:

"The general rule, no doubt, is that, except in cases where creditors have been deceived and misled by the corporation pretending to have a capital which it has not, a creditor can enforce no right against a shareholder greater than the corporation itself could enforce against him."

This same case also declares there can be nothing due the corporation except according to the terms of the contract which it has made with the stockholder. *Clarke v. Lincoln Lumber Co.* 59 Wis. 655, 18 N. W. 492. Fraud upon other subscribers not existing, and no creditors having been misled, there seems to be no occasion to visit upon the respondent a greater liability than those who were dealing with him arranged for by the agreement entered into. We find no reversible error in the record.

*By the Court.*—Judgment affirmed.