Argued July 11; affirmed December 31, 1934

# LOVELAND & CO., Limited, *v.* DOERNBECHER MANUFACTURING CO. et al.

(39 P. (2d) 668)

*Roscoe C. Nelson,* of Portland (Dey, Hampson & Nelson, of Portland, on the brief), for appellant.

*O. A. Neal,* of Portland, for respondent Doernbecher Manufacturing Company.

*Platt, Platt, Fales, Smith & Black,* of Portland, for respondent United States National Bank.

*M. M. Matthiessen,* of Portland (Wood, Montague, Matthiessen & Rankin, of Portland, on the brief), for respondent B. P. John.

RAND, C. J.  In this suit the plaintiff, a corporate creditor, seeks to enjoin the Doernbecher Manufacturing Company from paying out of its capital, or from any of its funds other than surplus profits, the balance of the price by it agreed to be paid under a contract for the purchase of its own stock.  The case is here upon an appeal by plaintiff from a decree dismissing the suit.

The Doernbecher Manufacturing Company, which will hereinafter be referred to as the defendant company, is a corporation organized under the laws of this state, its principal business being that of a manufacturer of furniture. As specified in its articles of incorporation, its capital stock consists of two million dollars divided into twenty thousand shares of the par value of $100 per share.

The contract was entered into on July 18, 1927, by the defendant company and B. P. John, all the stockholders assenting thereto. In and by the terms thereof, it was agreed that the company should purchase from John the 8,135½ shares of its capital stock then owned and held by him and pay him therefor the sum of $1,156,000, $156,000 to be paid in cash, the balance in ten annual installments of $100,000 each, together with interest thereon at the rate of six per cent per annum, the same to be payable on the first day of January of each year until the full purchase price had been paid.

The original articles of incorporation contained no provision purporting to authorize the defendant company to purchase its own stock, but shortly prior to the making of such contract these articles were amended by adding to Article 2 thereof, which defines the powers of the corporation, the following clause: "and to buy its own stock and to hold same as treasury stock and to sell and/or otherwise dispose of same".

At the time this contract was entered into the financial condition of the defendant company was prosperous, it having a large surplus over and above the amount of its capital stock and other liabilities and, if it then owed any indebtedness, the same has long since been paid.

It is not easy to determine the amount of these surplus profits at the time this contract was made. The

evidence indicates that the value of the corporate assets, after deducting the current indebtedness and the capital stock liability of two million dollars, was some eight or nine hundred thousand dollars. That these figures are reasonably accurate is supported by the assumption that, if the price contracted to be accepted and paid for that number of shares by men thoroughly familiar with the business of the company was a fair price, then the value of the total assets of the corporation, after deducting current liabilities, must have been approximately $2,840,000.

Due, however, we suppose largely to the financial depression, the business of the company since 1929 has not been profitable and, when this suit was commenced in December, 1932, all its surplus profits had been lost or expended and its capital had been impaired to a considerable extent. The defendant company, however, is a going concern and one of the large manufacturing concerns of the state. It is not now and never has been insolvent and, so far as the evidence shows, it has never defaulted in any of its obligations.

The plaintiff, although it is now a creditor of the defendant company, did not become such creditor until 1931, when it acquired certain debenture bonds of the par value of $415,800. These bonds were issued by The Furniture Corporation of America, Ltd., and, by some arrangement between that company and the defendant company, the defendant company contracted to pay. These bonds do not mature until October 1, 1945. The interest on the bonds had all been paid according to their terms when this suit was commenced. When plaintiff acquired these bonds, it had knowledge of the existence of the terms of the John contract and knew that five of said annual installments had not been paid.

One of the conditions of the contract for the purchase of the John stock was that his stock certificates

should be placed in the hands of the defendant United States National Bank of Portland, Oregon, and be held in escrow in said bank until all the purchase price had been paid. This condition is now being complied with and this, of course, precludes the reissue and resale of these shares by the defendant company so long as anything remains unpaid under the contract. That bank was joined as a defendant in the suit because of its being an escrow holder of the stock.

Upon this appeal the plaintiff argues that an Oregon corporation has the right to purchase its own stock provided its capital is kept intact and the payments are made from surplus profits only, but it insists that it is never permissible for a corporation to purchase its own stock out of its capital nor in any case unless at the time when the payment becomes due there are surplus profits from which the payment may be made. It then argues that, because the capital of the defendant company has been impaired and there are no surplus profits from which these future payments may be made, it is the duty of this court to enjoin the defendant company from paying the balance of the price from any funds of the company until there are surplus profits from which said payments may be made. It also contends that it is entitled to this relief notwithstanding that the plaintiff is a subsequent creditor and the defendant company is not in default upon any of its obligations to plaintiff.

The defendants likewise contend that an Oregon corporation has the right to purchase its own stock and insist that, if the corporation is solvent when the purchase is made and is not thereby rendered insolvent, a stockholder in selling his stock to the corporation becomes a creditor of the corporation for the purchase price and, as such creditor, is entitled, like any other general creditor, to be paid out of any corporate funds whether capital or otherwise. They also contend that,

regardless of whether this is the true rule or not, this plaintiff which is a subsequent creditor and having become such with full knowledge of the prior purchase, is in no position to complain whether the future payments are made from capital or otherwise.

There is a great conflict of authority as to the right of a corporation to purchase its own stock. The great weight of authority in this country upholds the right of a corporation to buy its own stock if the purchase is made in good faith and does not prejudice the rights of creditors: Cook on Corporations, vol. 2 (8th Ed.), section 311; Ballantine, Manual of Corporation Law and Practice (1930 Ed.), section 66, and authorities there cited. In *Shoemaker v. Washburn Lumber Company,* 97 Wis. 585 (73 N. W. 333), the court, after upholding the right of a corporation to purchase its own stock, said: "* * * provided the same is done in good faith, without intent to injure creditors thereof, and they are not injured thereby".

The rule permitting a corporation to purchase its own stock which is supported by the great weight of authority in this country is commonly called the American rule to distinguish it from the English rule, which denies the existence of the right.

In England the courts have held in a long and unbroken line of decisions that a corporation, unless expressly authorized so to do, cannot purchase its own stock. The leading case on that subject is *Trevor v. Whitworth,* L. R. 12 App. Cas. 409, decided in the House of Lords in 1887. In that case the company had gone into liquidation and certain former shareholders who had sold their shares to the company before the liquidation, and who were claiming to be creditors of the company for the balance of the price, were seeking to enforce payment thereof out of its paid-up capital as

against its remaining shareholders, to which relief they would have been entitled had they been valid creditors of the company, since in such case theirs would have been the prior claim. In that case, the company had purchased more than 4,000 shares out of its total issue of 15,000 shares. It was held that their claim must fail because the company did not have the power to purchase its own shares and the purchase was, therefore, ultra vires. In that and other English cases, the decisions were largely controlled by the fact that a purchase by a corporation of its own stock necessarily results in a reduction of its capital and, if there is to be a reduction of the capital of a corporation, it must be effected in the manner prescribed by Parliament. In that case Lord Herschell, after pointing out that the purpose of the statute was to assure those dealing with a company, where the liability is limited, "that the whole of the subscribed capital, unless diminished by expenditure upon the objects defined by the memorandum, shall remain available for the discharge of its liabilities", then said:

"* * * The capital may, no doubt, be diminished by expenditure upon and reasonably incidental to all the objects specified. A part of it may be lost in carrying on the business operations authorized. Of this all persons trusting the company are aware, and take the risk. But I think they have a right to rely, and were intended by the legislature to have a right to rely, on the capital remaining undiminished by any expenditure outside these limits, or by the return of any part of it to the shareholders. * * *

"What was the reason which induced the company in the present case to purchase its shares? If it was that they might sell them again, this would be a trafficking in the shares, and clearly unauthorized. If it was to retain them, this would be to my mind an indirect method of reducing the capital of the company."

In the same case, Lord Watson said:

"* * * persons who deal with, and give credit to a limited company, naturally rely upon the fact that the company is trading with a certain amount of capital already paid, as well as upon the responsibility of its members for the capital remaining at call; and they are entitled to assume that no part of the capital which has been paid into the coffers of the company has been subsequently paid out, except in the legitimate course of its business. * * *

"* * * If the shares are purchased with the view of being re-sold, that is simply a speculation with the funds of the company. If they are purchased with the view of their being retained by the company, that is a permanent withdrawal of the money invested in them from the trading capital of the company.''

In the same case, Lord Macnaghten said:

"* * * Whatever may fairly be regarded as incidental to the objects stated in the memorandum, the company is authorized to do. Everything beyond that is prohibited. Further, every limited company is required to state in its memorandum the amount of capital with which it proposes to be registered, divided into shares of a certain fixed amount. That is equivalent to a declaration that the capital is to be devoted to the objects of the company.''

He then quoted from Lord Justice Cotton in *Guinness v. Land Corporation of Ireland,* 22 Ch. D. 349, 375, as follows:

"From that it follows that whatever has been paid by a member cannot be returned to him. In my opinion it also follows that what is described in the memorandum as the capital cannot be diverted from the objects of the society. It is, of course, liable to be spent or lost in carrying on the business of the company, but no part of it can be returned to a member so as to take away from the fund to which the creditors have a right to look as that out of which they are to be paid.''

The Canadian courts follow the English rule. See *Alberta Flouring Mills Company v. Christie,* 58 Can. Sup. Ct. 208. In a number of our sister states the courts have also followed and approved the English rule, deeming it to be the safer and better rule. Perhaps the leading case so holding is *Maryland Trust Company v. National Mechanic's Bank,* 102 Md. 608 (63 Atl. 70). Also see *Crandall v. Lincoln,* 52 Conn. 73 (52 Am. Rep. 560); *Cartwright v. Dickinson,* 88 Tenn. 476 (12 S. W. 1030, 7 L. R. A. 706, 17 Am. St. Rep. 910); *Hall v. Alabama, etc. Co.,* 143 Ala. 464; *Merchants' National Bank v. Overman Carriage Company,* 17 Ohio C. C. 253; *Mancini v. Patrizi,* (87 Cal. App. 435, 262 P. 375), and *Kom v. Cody Detective Agency,* 76 Wash. 540 (136 P. 1155, 50 L. R. A. (N.S.) 1073).

The English rule has received the sanction of many of the leading text-writers, both English and American. In Green's Brice's Ultra Vires (1880 Ed.), p. 95, the author says:

"There is a great difference between dealing in the shares of other companies and in its own. The former is ordinary business, attended only with the usual risks of ordinary transactions, but the latter tends inevitably to breaches of their duty on the part of the directors, and to fraud and rigging the market on the part of the corporation itself. Consequently, a corporation, to possess such a power, must have it conferred by the plainest and most explicit language in its constating instruments."

Machen in his work on Modern Law of Corporations, vol. 1, section 622, says:

"As heretofore stated, a reduction of capital affects the rights of shareholders and especially creditors more seriously than an increase. The capital of a corporation or limited company is the fund provided by law for the carrying on of its business and the payment of its debts; and any attempt, without special legislative

authority to diminish the same is both ultra vires and illegal, and should be ruthlessly stricken down by the courts. This rule is founded in the policy of the law, and cannot be evaded by any artifice. A decrease of capital, so far as creditors are concerned, is most serious when it takes the form of a return to shareholders of capital once paid in or of a release from liability for uncalled capital.''

In section 628, op. cit., he says:

''In America, many courts uphold the same sound and wholesome doctrine as the English cases. But it must be conceded that a somewhat larger number of the American courts have taken the view that a corporation may without express statutory authority purchase its own shares, provided the purchase is entered into bona fide and does not endanger the claims of creditors. It should be observed that the American cases which agree with the English doctrine are often well considered and fully reasoned, whereas those which uphold the contrary view generally lack any extended examination of the subject   *   *   *.''

Mr. Morawetz in his work on Private Corporations, vol. 1 (2d Ed.), section 112, says:

''*   *   *   No verbiage can disguise the fact, that a purchase by a corporation of shares in itself really amounts to a reduction of the company's assets, and that the shares purchased do in fact remain extinguished, at least until the reissue has taken place. The fact that such a transaction may not necessarily be injurious to any person is not a sufficient reason for supporting it. It is contrary to the fundamental agreement of the shareholders, and is condemned by the plainest dictates of sound policy. To allow the directors to exercise such a power would be a fruitful source of unfairness, mismanagement, and corruption. It is for these reasons that a shareholder cannot be allowed to withdraw from the corporation with his proportionate amount of capital, either by a release and cancellation before the shares have been paid up, or by a purchase of the shares with the company's funds.''

See also his discussion of this subject in section 434, op. cit. Ballantine, op. cit., section 66, says:

"It is argued in the English cases that if the corporation purchases its shares with the intention of reissuing them this would amount to speculation in the shares, and would be unauthorized. If the corporation does not intend to resell them, this would be an indirect and improper method of reducing the capital of the company. A transfer of capital to a stockholder for a surrender of his stock has the same effect upon creditors as the payment of a dividend from capital. It leaves in the corporate treasury a piece of paper in the place of valuable assets. Even a solvent corporation may not pay dividends out of capital. Moreover it is pointed out that the purchase increases the relative strength of the large holders and may even convert them into a majority."

See also 2 Minn. L. Rev. 456; 15 Va. L. Rev. 625.

In discussing the purchase by a corporation of its own shares, Judge Hand, in *In re Tichenor-Grand Co.*, 203 Fed. 720, said:

" *  *  * It is merely a method of secret distribution, against the deceit of which its creditors have absolutely no means of protection. The fund which they have the right to rely upon has been surreptitiously taken from them. It seems to me very little relief against the evils which such a right causes to limit it to cases where the corporation is thought to be solvent. It is a strange thing, I think, that there have been cases which permit the practice, which seems to me to be inevitably mischievous commercially."

He also made the further objection that such purchases "necessarily result in keeping up the appearance of a capital which has been actually depleted".

The dangers incident to the recognition of the right of a corporation to purchase its own stock pointed out by the text-writers and law-writers to which we have referred have led the legislatures in a number of the

states to prohibit the right altogether. In New York, although the right of a corporation to purchase its own stock is conferred by statute, it is made a misdemeanor under section 664 of its penal laws for the directors of a stock corporation to apply any portion of the funds of such corporation, except surplus profits, directly or indirectly in the purchase of its own shares. The same dangers have also been recognized by the legislature of this state in prohibiting state banks and trust companies from purchasing their own stock except when necessary to prevent loss upon a debt previously contracted in good faith. The same prohibition applies to national banks under the federal law.

In those states which follow the English rule, it is permissible for a corporation to purchase its own shares in payment of an antecedent debt not otherwise collectible and it also may take its own shares by way of a gift or bequest. In neither of these cases does the transaction result in a reduction of the capital of the corporation. As pointed out by the text-writers in a number of the cases which first announced the American rule, those cases arose over an acceptance by the corporation of its own stock in payment of a debt which otherwise could not have been collected, and, since it was permissible under such circumstances, the ruling in those cases was made the basis for the later rule that a corporation had the right to purchase its own stock. This reasoning, as pointed out by the text-writers, is both illogical and unsound.

In this state there is no statute directly dealing with the problem. Section 25-205, Oregon Code 1930, prescribes that the articles of incorporation shall specify the amount of the capital stock and the number of shares into which the same shall be divided; and section 25-202 requires that copies of the articles shall be filed both in the office of the secretary of state and in that of the

office of the county clerk of the county where the principal office or place of business is to be carried on. Section 25-223 provides a way by which the capital stock and the number of shares may be increased or diminished, and section 25-219 prohibits the payment of a dividend by the directors of an insolvent corporation, or one which renders it insolvent, or out of assets other than net profits or surplus, and for a violation thereof makes the assenting directors "jointly and severally liable for the debts of the corporation then existing or incurred while they remain in office to the extent of such dividends so declared".

These or similar provisions are contained in the statutes of most, if not all, of the states which follow the American rule, and, in most of the cases which sustain that rule, there had been, as in this case, no attempt made to reduce the capital stock in the manner prescribed by the statute, although that was held to be a determining factor in the English courts. It follows, therefore, that unless this court should adopt the rule announced in *Maryland Trust Company v. National Mechanic's Bank,* supra, that the fact that the legislature had prescribed a particular mode to be pursued for the accomplishment of such a result necessarily excludes the right to resort to any other or different method, it is obvious that the statute of this state affords no solution of the question, and recourse, therefore, must be had to the principles of the common law.

██ It is settled law that the charter of a corporation is the measure of its powers and that a corporation can exercise only such powers as are conferred upon it, either in express terms or by necessary implication. The implied powers, however, of a corporation are not restricted to those which are indispensably necessary, but include those which naturally arise from the

nature of the business and are appropriate, convenient and suitable for carrying out the express powers: 1 Cook, op. cit., section 3.

■■ Where corporations are organized under the general law, as is required in this state by Article XI, section 2, of our constitution, the charter of a private corporation consists not only of the articles of incorporation but includes all general statutes applicable to that class of corporations and all persons, whether stockholders or creditors, who have dealings with the corporation are conclusively presumed to do so with knowledge of its charter and of its charter rights, and this rule is applicable to persons dealing with a foreign corporation doing business in another state: 1 Cook, op. cit., section 2, and authorities there cited. It must be remembered, however, that within the limits of its chartered powers a solvent corporation has the same rights that a natural person has in the transaction of business and holds its property as a private individual holds his: *In re Fechheimer Fishel Company,* 212 Fed. 357.

■ The capital stock of a corporation is the sum fixed by the corporate charter as the amount paid in or to be paid in by the stockholders for the conduct of its business and for the payment of its debts. It is a fund set apart by law for the prosecution of the corporate business and for the benefit of its creditors. As said in *Macbeth v. Banfield,* 45 Or. 553 (78 P. 693, 106 Am. St. Rep. 670):

"The capital of a corporation is the basis of its credit. It is a substitute for the individual liability of those who own its stock. People deal with it and give it credit on the faith of it. They have a right to assume that it has paid in capital to the amount which it represents itself as having; and if they give it credit on the faith of that representation, and if the representation is false, it is a fraud upon them. * * *"

The trust fund doctrine first enunciated by Judge Story in *Wood v. Dummer*, 3 Mason 308, that a corporation holds its property in trust for the benefit of its creditors has not been accepted in this state as applicable to solvent corporations. It, of course, applies to insolvent corporations, or where a court has taken hold of the corporate assets for the purpose of distribution. The principle, however, is reflected in section 25-219, Oregon Code 1930, where the payment of a dividend except from surplus profits is prohibited, and would seem to be applicable where any part of the paid-up capital is returned to a stockholder in payment of his shares to the injury of a corporate creditor.

Our statute, as above stated, prescribes that the articles of incorporation shall specify the amount of the capital stock and the number of shares into which the same may be divided. By its charter, the capital stock of the defendant company was fixed as two million dollars and the number of its shares as twenty thousand. By a subsequent amendment of its articles, the corporation attempted to confer upon itself the right to purchase its own shares. Under this supposed power and without any attempt to comply with the provisions of the statute under which a reduction of the capital stock could have been lawfully made, and without any public pronouncement of the fact as would have occurred if the statute had been complied with, the defendant company entered into the John contract, and, if the transaction is valid, its capital stock and the number of its shares were each thereby reduced to nearly one-half of the amounts specified in the charter. It is clear that if a corporation, by merely amending its articles and without a compliance with the statute, can be permitted by the purchase of its own shares to reduce the amount of its capital stock to nearly one-half of the amount specified in its charter, then there would seem to be no

limit to the exercise of such power and a corporation, by purchasing all its shares of stock, would still be a corporation although it had neither capital stock nor shares.

The question of whether a corporation may purchase its own shares has not been directly passed upon by this court. The question was involved but not decided in *Sargent v. Waterbury,* 83 Or. 159 (161 P. 443, 163 P. 416). That was an action brought under a statute which, while generally prohibiting a bank from purchasing its own stock, permitted it to do so when necessary to prevent a loss upon a debt previously contracted in good faith. It is not clear from the opinion in that case whether the transaction there complained of merely amounted to a surrender or forfeiture of the shares which did not involve any payment out of the funds of the bank, or was in fact a purchase by the bank of its own stock in payment of a pre-existing debt entered into in good faith. Whether the holding in that case that the transfer of the stock was valid was because of this particular provision in the statute is not clear from the opinion and, hence, the case is not authoritative upon this question.

We think, however, that this court approved the English rule in *Willis v. Nehalem Coal Co.,* 52 Or. 70, (96 P. 528), where this court said:

"\* \* \* for as stated by Mr. Justice Lamar, in Morgan v. Struthers, 131 U. S. 246, 254 (9 Sup. Ct. 726, 729: 33 L. Ed. 132) : 'A corporation has no legal capacity to release an original subscriber to its capital stock from payment of it, in whole or in any part, and that any arrangement with him by which the company, its creditors or stockholders, shall lose any part of that subscription, is ultra vires and a fraud upon creditors and the co-subscribers: Burke v. Smith, 16 Wall. (U. S.) 390, 395 (21 L. Ed. 361); Bedford Railroad Co. v. Bowser, 48 Pa. 29; Green's Brice's Ultra Vires. This

doctrine rests upon the principle that the stock subscribed, both paid and unpaid, is the capital of the company, and its means of carrying out the object for which it was chartered and organized.'' '

For as pointed out in *Maryland Trust Company v. National Mechanic's Bank,* supra, if a corporation is incompetent to release subscribers to its capital stock whose subscriptions have not been paid, it is equally without authority to expend the fund represented by the capital stock to purchase shares held by a stockholder who has paid for them. From this it would seem to follow that where the payment of a dividend from capital is prohibited by statute the return of a shareholder's entire contribution should not be allowed even though the shares are received in return: *Hamor v. Taylor-Rice Eng. Co.,* 84 Fed. 392; *Tiger v. Rogers Cotton Cleaner Co.,* 96 Ark. 1 (130 S. W. 585, 30 L. R. A. (N. S.) 694, Ann. Cas. 1912B, 488); *Buck v. Ross,* 68 Conn. 29 (35 Atl. 763, 57 Am. St. Rep. 60); *In re S. P. Smith Lumber Co.,* 132 Fed. 618; 15 Minn. Law R. 1.

■■ It is an inherent quality or attribute of stock that it confers upon its holder the right to attend stockholders' meetings and to participate in the election of its board of directors, to share in the surplus profits, to require that the corporate property and funds shall not be diverted from their original purposes and, upon dissolution, to share in the assets which remain after the debts are paid. In the instant case, the evidence shows that every stockholder, with full knowledge of the terms of the John contract, not only assented but actively participated in the making of it. Such action upon their part estops them from questioning the validity of the contract and none of them are complaining. The question, therefore, is one not raised by a non-assenting stockholder but by a subsequent creditor who volun-

tarily became a creditor of the defendant company with full knowledge of the prior purchase.

■ There remains, therefore, only the question of whether the plaintiff is in a position to complain of the purchase of the John stock by the defendant company. That it is a creditor of the defendant company is established by all the evidence. The rule is stated by Ballantine, op. cit., section 66, as follows:

"Even in those jurisdictions in which it is held that a corporation may purchase its own stock, the rule is subject to the condition that the purchase shall be made in good faith and without prejudice to the rights of other stockholders or creditors. It is unauthorized and invalid if made for the purpose of defrauding or injuring other stockholders or creditors of the corporation, or if it does in fact defraud or prejudice creditors or other stockholders, though made in the most perfect good faith.

"The basis of the financial responsibility of the company is the fund contributed by the subscribers to the common venture. If all the stockholders 'sold' their shares to the company in the end the corporation would vanish into nothing and only the cancelled stock certificates would remain in the empty treasury to attest the former existence of the corporation. If a stockholder sells or surrenders his stock to the corporation in exchange for corporate assets, knowing that the result will be to render the corporation insolvent, the transfer is fraudulent and invalid as against existing creditors. If it is intended that the corporation shall continue in business and incur indebtedness, the creditors relying on the appearance of its previous solvent condition continuing, the stockholder will be estopped to claim that his relations to the corporation were severed by the transaction, and the transaction will be void as to subsequent creditors. It is the general doctrine that subsequent creditors cannot be regarded as prejudiced by any such purchase unless the purchase was made in anticipation of possible future insolvency or the remaining property was of insufficient value to afford ample resources for the debts of the corporation.

"The time at which the corporation that purchases its own stock must have surplus earnings or accumulated profits over and above its capital stock is at the time the corporation is called upon to pay for the stock. The capital stock takes the place of individual liability. In the case of Re Fechheimer Fishel Co., (212 Fed. 357), the court held that the note of a New York corporation, given in payment of its own stock, was unenforceable as against creditors if the corporation was insolvent at the time of maturity, although the note was given in good faith and at a time when the company was solvent. In effect such a note is but a promise to pay out of surplus profits if they exist."

Counsel for plaintiff very strenuously argue that plaintiff is entitled to an injunction restraining the defendant company and its officers from paying out of its capital any part of the balance of the purchase price of the John stock, notwithstanding that it had knowledge of the purchase before becoming a creditor of the defendant company, and that none of defendant's obligations to plaintiff are shown to be in default. We find no authority in any of the cases cited or in any of the textbooks which would authorize the issuance of an injunction under the facts proven in the instant case. And if the true rule be that stated by the author last cited, namely: "that subsequent creditors can not be regarded as prejudiced by any such purchase unless the purchase was made in anticipation of possible future insolvency or the remaining property was of insufficient value to afford ample resources for the debts of the corporation", then the facts proven are not such as to entitle the plaintiff to injunctive relief.

There is, of course, a close analogy between a payment of a dividend out of capital which is prohibited by the statute and the payment for stock out of capital, and the effect upon creditors is the same in the one case as in the other. From this it would seem that the statu-

tory prohibition against the payment of a dividend from capital would imply a like prohibition against the payment for stock out of capital and would seem to impose the same liability upon the directors of the corporation responsible therefor in the one case as in the other. Upon that question, however, we pass no opinion since it is not necessary for decision in this case.

It should be noted, however, that, while section 25-219, Oregon Code 1930, which prohibits the payment of a dividend other than from surplus profits implies the right to pay dividends from surplus profits which right, of course, exists independently of statute, yet that statute contains no provision from which the right of a corporation to purchase its own stock can. be implied even when paid for from surplus profits. In New York, where a corporation agrees to purchase its own stock and gives a note in payment, the purchase is invalid and the note uncollectible, though the corporation be solvent, if at the time for payment of the note it has no surplus: *In re Fechheimer-Fishel Co.,* supra; *Cross v. Beguelin,* 252 N. Y. 262 (169 N. E. 378); *Topken, Loring & Schwartz, Inc. v. Schwartz,* 249 N. Y. 206 (163 N. E. 735, 66 A. L. R. 1179). And such seem to be the rule in many of the cases where the American rule is followed.

We, therefore, hold, for the reasons stated above, that the plaintiff is not entitled to the injunctive relief prayed for in the complaint, under the facts proven in this case. If by reason of the payment by the corporation of any installment hereafter to become due, the corporation is thereby rendered insolvent, a different question will then arise. Upon that question we express no present opinion since not now necessary for decision.

The larger question of whether an Oregon corporation has the right to purchase its own shares is like-

wise not now necessary for decision. That question involves a matter of serious import and is one with which the public is vitally concerned. If the right is to be recognized, therefore it should be sanctioned by the legislature, where all proper safeguards for the protection of creditors and stockholders may be imposed, rather than by the courts. It not being necessary for decision at this time, it is left open for future decision unless previously settled by prior enactment.

The decree of the lower court must, therefore, be affirmed.