GEORGE S. TRACY v. PERKINS-TRACY PRINTING COMPANY AND OTHERS.
JAMES H. LEVY, APPELLANT.

153 N. W. (2d) 241.

September 22, 1967—No. 40,503.

160

*Robins, Davis & Lyons, Elliot S. Kaplan,* and *Howard A. Patrick,* for appellant.

*Briggs & Morgan, Richard E. Kyle,* and *David C. Forsberg,* for respondent.

SHERAN, JUSTICE.

Appeal from a district court judgment.

Action was instituted by George S. Tracy against the Perkins-Tracy Printing Company, a corporation, upon the theory that the parties had entered into an agreement on July 31, 1959, for purchase by the corporation of its stock from plaintiff, with the corporation's obligation to make installment payments secured by a chattel mortgage on certain corporate personalty and an escrow of the stock; that the corporation was in default in its payments; and that plaintiff was entitled to judgment for the unpaid part of the agreed purchase price and foreclosure of the security.

After the action was instituted, defendant was declared bankrupt and the trustee in bankruptcy, properly added as a party defendant, alleged by way of answer that enforcement of the purchase agreement would be violative of Minn. St. 301.22, subd. 6, forbidding the purchase by a corporation of its own stock except from surplus. The trustee counterclaimed for $26,250 upon the theory that the defendant corporation had made payments in this amount to plaintiff during the period from October 1, 1961, to June 1, 1963, in contravention of the cited statute.

## THE TRIAL COURT'S DECISION

At the close of the trial the district court made findings of fact and conclusions of law which we summarize: Defendant Perkins-Tracy was engaged in the printing business in St. Paul for more than 40 years prior to July 31, 1959. Plaintiff owned 50 percent of the outstanding stock of said corporation, the remaining 50 percent being owned by his brother, Frank Tracy. They were in control of the corporation as directors and officers together with Alfred J. Lethert, the corporation accountant. For several years prior to July 31, 1959, plaintiff's salary from the corporation averaged $25,000 per year. The business of the corporation increased through the years and on July 31, 1959, it had a surplus of $261,036.76 and a net worth of $343,661.76.

Sometime before July 31, 1959, a dispute arose between Frank Tracy and plaintiff concerning the management policies of the company. As a result, on July 31, 1959, plaintiff entered into a written contract with

defendant corporation, pursuant to which plaintiff undertook to do the following:

(a) To sell to defendant corporation all of his shares of stock, 826¼ shares of common stock, in said company.

(b) To sell to defendant corporation all of his shares of stock, 20 shares of Class A common and 80 shares of Class B nonvoting stock, in Southern Minnesota, Inc., a corporation separate and distinct from Perkins-Tracy.

(c) To resign his positions as director, president, and treasurer of Perkins-Tracy.

(d) To refrain for the duration of the contract (a period in excess of 8 years) from engaging in the printing business in competition with defendant corporation within the State of Minnesota.

(e) To obtain the resignation of any director or officer of defendant corporation, other than Frank Tracy.

In consideration defendant corporation agreed:

(a) To pay to plaintiff the total principal sum of $175,000, of which $43,750 was payable in cash at the time of the execution of the agreement and the balance of $131,250 was payable in monthly installments of $1,312.50 until paid, and, in addition, to pay interest on the unpaid balance at the rate of 5 percent per annum, payable monthly.

(b) To deliver to plaintiff its promissory note for the unpaid principal balance of $131,250.

(c) To deposit in escrow as security for the payments the 826¼ shares of defendant corporation and the 100 shares of Southern Minnesota, Inc., purchased from plaintiff.

(d) To make, execute, and deliver to plaintiff chattel mortgages on three pieces of equipment to secure the performance of the agreement.

Pursuant to the contract, plaintiff assigned, transferred, and delivered to defendant corporation the stock certificates evidencing his ownership of shares in Perkins-Tracy and Southern Minnesota, Inc. The certificates were endorsed in blank. Thereafter, defendant corporation executed separate assignments of the Perkins-Tracy shares in blank and deposited them in escrow.

Simultaneously with the transfer of the stock, defendant corporation paid to plaintiff the sum of $43,750 in cash and delivered to him its promissory note in the amount of $131,250 payable as provided in the July 31, 1959, agreement. At the same time and to further secure the performance of said agreement and the payment of said note, defendant corporation made, executed and delivered to plaintiff chattel mortgages on certain of its equipment. The chattel mortgages were duly filed for record in the proper offices and constituted valid first liens on the equipment described therein.

On July 31, 1959, the indebtedness of defendant corporation amounted to $39,953.73, all of which was paid in full within a few months thereafter.

On July 31, 1959, plaintiff ceased to be a stockholder of defendant corporation and became a secured creditor. The transaction was recorded upon the financial statements of the corporation in August 1959. The subsequent financial statements of the corporation disclose the transaction fully. The chattel mortgages also fully disclose the transaction. There was no misrepresentation concerning the transaction and no person was misled thereby.

Plaintiff has fully performed all of his obligations under the July 31, 1959, contract.

Defendant corporation made payments to plaintiff on the indebtedness up to and including the month of June 1963. It failed to make the installment payments of principal and interest which were due and payable on July 1, 1963, and thereafter. On July 19, 1963, plaintiff served written notice of default and, pursuant to the provisions of the note, declared the entire indebtedness due and payable. On or about December 4, 1963, he commenced this foreclosure proceeding.

On May 31, 1963, defendant corporation had no surplus; on June 30, 1964, it had no surplus; and on October 2, 1964, the corporation was adjudicated bankrupt, pursuant to a voluntary petition in bankruptcy filed in the United States District Court (D. Minn.). Defendant James H. Levy was duly appointed trustee in bankruptcy.

Pursuant to an order of the referee in bankruptcy and to stipulation of

the parties, the trustee in bankruptcy intervened as a party defendant in this action and assumed its defense on behalf of the bankrupt estate.

The referee in bankruptcy, on or about March 29, 1965, made and filed in the bankruptcy proceeding an order directing the sale of all of the property of defendant corporation (including the equipment on which plaintiff had chattel mortgages) free and clear of all liens and encumbrances, with a provision for the transfer of plaintiff's liens to the proceeds of the sale. Said order further provided that the sum of $60,000 from the proceeds of said sale be set aside and held by the trustee with the liens to attach thereto pending final determination of the amount and validity of said liens by the court. Pursuant to this order, the property was sold free from all liens and encumbrances and defendant trustee in bankruptcy now holds the sum of $60,000 derived from the proceeds of said sale, subject to the lien claim of plaintiff. It appears from the files and records in the bankruptcy proceeding that the $60,000 was invested in bank saving certificates and interest is accruing thereon.

All of the creditors of the bankrupt estate extended credit to defendant corporation subsequent to July 31, 1959, with notice of the transaction of that date and of plaintiff's rights thereunder.

At no time has the trustee in bankruptcy or defendant corporation or any other person attempted to rescind or cancel the contract of July 31, 1959, the promissory note, or the chattel mortgages, or to restore plaintiff to his former position.

From these facts the trial judge concluded that the agreement of July 31, 1959, was and is valid and subsisting; that the promissory note executed and delivered by defendant corporation to plaintiff was and is valid and enforceable; that the chattel mortgages delivered by the corporation to plaintiff in connection with the July 31, 1959, contract created valid and subsisting liens upon the equipment therein described; that said liens were and are valid and subsisting liens to the extent of the unpaid balance on the indebtedness of defendant corporation to plaintiff; that as a result of the sale in the bankruptcy court, the liens created by said chattel mortgages have attached to the $60,000 in the hands of defendant trustee to the extent of plaintiff's claim.

Because the chattel mortgages provide for attorneys' fees and expenses of foreclosure to be paid out of the proceeds of foreclosure sale, the trial court awarded to plaintiff the sum of $3,000 therefor, provided that the total amount payable to plaintiff out of the fund in the possession of defendant trustee should not exceed the $60,000 plus earned interest.

The amount found to be due and owing to plaintiff consists of:

(a) The principal sum of $51,330.88.

(b) Interest thereon at the rate of 5 percent per annum from June 1, 1963.

(c) Attorneys' fees in the amount of $3,000.

The total of the amounts specified was adjudged to be a valid first lien upon the sum of $60,000 held by defendant trustee and the interest which may be earned thereon.

Recovery on the counterclaim was denied.

### Issues On Appeal

Defendants' post-trial motion having been denied, defendant trustee appeals to this court, asserting that the trial court erred in finding that the sum of $51,330.88 was due and owing to plaintiff with interest; in finding that the amount specified constituted a valid first lien upon the fund of $60,000 and interest thereon now held by defendant trustee as a substitute for the mortgaged chattels; in failing to find that on December 31, 1962, defendant corporation had no earned or paid-in surplus; and in failing to allow recovery to defendant trustee on behalf of defendant corporation of all sums paid by the corporation to plaintiff subsequent to that date.

### Decision

We affirm the decision of the trial court upon the ground that, defendant corporation having had adequate surplus funds on the date the agreement was made to cover the entire purchase price of the stock, the liens of the chattel mortgages were not affected by the subsequent depletion of corporate surplus. With respect to the counterclaim, we hold that the trial court was not required to find as a matter of law that payments were made by defendant corporation to plaintiff pursuant to the purchase agreement after the corporate surplus had been impaired.

■ Minn. St. 301.22, subd. 6, provides:

"A corporation may purchase or redeem shares of its own stock, whether pursuant to contract previously made or otherwise, only as follows:

"(1) Out of earned surplus;

"(2) Out of paid-in surplus; * * *."

The evident purpose of the statute is to protect the interests of creditors from capital encroachments benefiting stockholders. The meaning of the statute is not clear as applied to the present situation where the purchase of the stock was made at a time when the amount of the corporate surplus exceeded the agreed purchase price and the obligation to make the deferred payments and the chattel mortgage were fully disclosed by corporate and public records. There are no controlling Minnesota decisions.

It is clear to us that the agreement of July 31, 1959, served to transfer the title of the stock owned by plaintiff to defendant corporation. See, Minn. St. 301.02, subd. 7; Wolff v. Heidritter Lbr. Co. 112 N. J. Eq. 34, 163 A. 140; Beal v. Essex Sav. Bank (C. C. D. Mass.) 67 F. 816.

The recorded chattel mortgages given in exchange for the stock transferred title of the mortgaged property from defendant corporation to plaintiff—a title indefeasible until payment of the secured obligation was made or waived. See, Land O' Lakes Dairy Co. v. County of Wadena, 229 Minn. 263, 39 N. W. (2d) 164, affirmed, 338 U. S. 897, 70 S. Ct. 251, 94 L. ed. 552, rehearing denied, 338 U. S. 945, 70 S. Ct. 428, 94 L. ed. 583; In re P. T. G. Grain Serv. (D. Minn.) 185 F. Supp. 332.

If payment of the agreed purchase price on July 31, 1959, would have resulted in an impairment of the capital of defendant corporation as of that date, the sale would have been in violation of § 301.22, subd. 6. See, Annotation, 47 A. L. R. (2d) 758. But on that date (even though we assume for the purpose of discussion that the entire consideration was in exchange for the stock) the corporation's surplus of $261,036.76 was substantially more than the consideration stated in the contract.

If no mortgage had been given, it could be reasoned (and has been by

respected courts—see, for example, In re Fechheimer Fishel Co. [2 Cir.] 212 F. 357) that the deferred payments are payable from surplus only, regardless of the financial condition of the corporation at the time of the sale. If there were creditors who became such before July 31, 1959, it could be argued, in support of this resolution, that they extended credit in reliance upon the capital then existing and reasonably assumed that no subsequent agreement between the corporation and its shareholders would cause impairment. But in this case, there are no such prior creditors.

Also, if no mortgage had been given, it could be argued that creditors who became such after July 31, 1959, were entitled to consider the capital of defendant corporation as a "trust fund" of which they, until paid, were the beneficiaries and that the corporation, as the "trustees of the fund" should not be allowed to use it for the discharge of obligations to shareholders even though these obligations had their inception before the credit was extended. But the extent to which this rationale can be carried in Minnesota where the capital "trust fund" theory has been specifically rejected (Hospes v. Northwestern Mfg. & Car Co. 48 Minn. 174, 50 N. W. 1117, 15 L. R. A. 470) is at least doubtful.

With no Minnesota decisions in point involving these aspects of the case, we prefer to leave resolution of the ambiguity which would exist here had no chattel mortgages been given for legislative clarification and rest our decision, as we believe the trial court did, upon the ground that the rights of the plaintiff to the proceeds of the personal property embraced in the chattel mortgages vested when the mortgages were executed and cannot be voided now by resort to § 301.22, subd. 6. At the time the chattel mortgages were given, no capital impairment resulted from the transaction. Although defendant corporation, the mortgagor, continued in possession of the mortgaged property, the recording of the mortgages gave notice of plaintiff's rights under them. Plaintiff's title was, of course, subject to defeasance upon payment of the debt secured. But the debt was not paid and we can see no logical reason on the present record for denying plaintiff's rights, which vested in 1959, because of events which occurred after that time for which he was in no way responsible. See, First Trust Co. v. Illinois Central R. Co. (8 Cir.) 256 F. 830. We do

not agree with defendant trustee's position that a chattel mortgage cannot be foreclosed because the funds available to the corporation for payment of the debt secured cannot be used for that purpose. See, Ovsiovitch v. Federal Tool & Mfg. Co. 94 N. J. Eq. 744, 121 A. 671. In so holding, we recognize authority from other jurisdictions which seems to be to the contrary. See, Clark v. E. C. Clark Machine Co. 151 Mich. 416, 115 N. W. 416; In re Bell Tone Records, Inc. (D. N. J.) 86 F. Supp. 806; Schreiber v. San Joaquin Exploration Co. 125 Cal. App. (2d) 171, 270 P. (2d) 19.

What purpose would there be in taking or giving a mortgage in a situation such as this if the power to foreclose existed only so long as there was no necessity of resorting to the security? If the security had not been given, it is reasonable to believe that the seller of the stock could and would have insisted on payment in cash. Had he done so, defendant corporation would have been able to make payment from its surplus which was then in excess of the agreed price of the stock. And if, in such event, the corporation, in order to raise necessary cash, had mortgaged its personal property to a stranger to secure a loan payable in installments, the mortgagee could foreclose the mortgage in event of default regardless of the condition of the surplus account at the time of foreclosure. Or again, if the stockholder had taken the price in cash when the agreement was made and, by a separate transaction, made a loan to the corporation secured by a chattel mortgage, this security interest could not be defeated by the subsequent disappearance of the corporate surplus.

■ Our decision on this point might not meet the problem fully if defendant trustee is correct in his position that the trial court was required as a matter of law to find that defendant corporation made payments out of nonsurplus assets during the period from October 1, 1961, to June 1, 1963, because in such event the $60,000 substituted for the mortgage minus the payments so made might be less than the judgment awarded. But plaintiff's case did not depend upon proof of the financial condition of the corporation during this period. His action was to foreclose the mortgages, his theory being that he was entitled to do so in order to collect so much of the purchase price as remained unpaid.

Because at the time of the agreement there were adequate funds in the surplus account to have paid for the stock in cash had the parties elected to do so, the financial status of the corporation during the intervening period became significant in the case only because defendant trustee by his counterclaim asserted that payments were made by the corporation to the plaintiff at a time when the requisite surplus did not exist. This was an affirmative claim for relief and the burden of proving the elements of it was with the counterclaimant. See, Ewing v. Swenson, 167 Minn. 113, 208 N. W. 645. Since there was no persuasive evidence with respect to the financial condition of defendant corporation during the period in question, the trial judge properly rejected the counterclaim for the failure of the counterclaimant to sustain his burden of proof.

■ The trial court allowed attorneys' fees in the amount of $3,000 without the aid of testimony as to the precise nature of the services rendered or the reasonable value of such services. But in this particular situation the legal services rendered by the attorneys for the foreclosing plaintiff were apparent to the trial judge from an examination of the files and records of the case and from his observation of the trial as it was conducted before him. In light of the amount involved and the complexity of the issues raised, we believe that the trial judge was justified in making the allowance which was made without the necessity of soliciting expert opinions on the question. See, Larson-Roberts Elec. Co. v. Burdick, 267 Minn. 486, 127 N. W. (2d) 163; In re Mill City Plastics (D. Minn.) 129 F. Supp. 86.

Affirmed.