Jack NEIMARK, Plaintiff-Respondent,

v.

MEL KRAMER SALES, INC., and Delores Kramer, Director and Shareholder of Mel Kramer Sales, Inc., and as personal representative of the Estate of Mel Kramer, and David Gutkin, Director of Mel Kramer Sales, Inc., and Sara Lee Begun, Director of Mel Kramer Sales, Inc., Defendants-Appellants.†

Court of Appeals

*No. 80–1029. Submitted on briefs January 21, 1981.—Decided April 27, 1981.*
(Also reported in 306 N.W.2d 278.)

† Petition to review denied.

For the defendants-appellants the cause was submitted on the briefs of *Godfrey & Kahn, S.C.,* and *Richard S. Marcus* and *William H. Alverson,* of Milwaukee.

For the plaintiff-respondent the cause was submitted on the brief of *Peregrine, Marcuvitz, Cameron & Peltin, S.C.,* and *Sherwin C. Peltin, Howard B. Schoenfeld* and *Michael J. Jassak,* of Milwaukee.

Before Decker, C.J., Moser, P.J., and Cannon, J.

DECKER, C.J.    This appeal questions whether the trial court erred in this shareholder's derivative action by ordering specific performance of a stock redemption agreement upon death of the principal shareholder of defendant corporation. We vacate the judgment and remand with directions.

Plaintiff seeks specific performance of an agreement for the redemption of stock owned by the late Mel Kramer (Kramer), founder and majority shareholder of Mel Kramer Sales, Inc. (MKS). MKS is a closely-held Wisconsin corporation engaged in the business of selling

automotive parts and accessories. The interests of the shareholders are:

| Shareholder | Number of Shares | Percentage |
|---|---|---|
| Mel Kramer/Estate of Mel Kramer | 1,020 | 51 |
| Delores Kramer | 200 | 10 |
| Jack Neimark | 580 | 29 |
| Jerome Sadowsky | 200 | 10 |

Kramer died on December 5, 1976. On May 9, 1977, Delores Kramer, Kramer's widow, was appointed personal representative of his estate. Delores Kramer is president and a director of MKS. Jack Neimark is vice-president and a director. Directors David Gutkin and Sara Lee Begun are relatives of Delores Kramer.

On June 22, 1976, a stock redemption agreement was executed by MKS and its stockholders. The agreement requires MKS to purchase, and a deceased shareholder's estate to sell, all of the deceased shareholder's stock in MKS at $400 per share, less a specified credit.[1] The agreement also provided Delores Kramer with the option to sell her shares to MKS in the event of Kramer's death.

Under the agreement, Kramer's 1,020 shares were to be redeemed by MKS within thirty days after the appointment of his estate's personal representative, Delores Kramer, in the following manner. The redemption price of $408,000, less a specifically provided $50,000 credit, constituting a net price of $358,000, was to be paid in installments of $100,000 at the closing, and the balance in five consecutive annual installments. The first installment after the closing was to be $43,200, with four remaining installments of $53,700, plus interest at 6%. If Delores Kramer elected to redeem her shares, her

---

[1] The $50,000 credit was funded by a group life insurance policy paid to Kramer's beneficiary.

stock was to be purchased at the same per-share price payable in two installments of $40,000, on the sixth and seventh anniversaries of the closing, plus interest at 6% after five years.

The agreement provided that the $100,000 payment for Kramer's shares was to be funded by a life insurance policy on Kramers' life. Upon Kramer's death, MKS received the $100,000 proceeds from the life insurance policy, and it was reflected in MKS's retained earnings as of December 31, 1976.

The agreement also provided that if MKS did not have sufficient surplus or retained earnings to purchase the deceased shareholder's stock, the parties would contribute the necessary capital to enable MKS to lawfully redeem the decedent's shares. It was also agreed that the parties would be entitled to specific performance of the agreement.

After Kramer's death, Delores Kramer indicated a reluctance to have MKS redeem the shares owned by her husband's estate. Neimark insisted that MKS redeem the estate's shares, and on May 23, 1977, the board of directors met to consider Neimark's demand. The MKS attorney who was the author of the stock redemption agreement was present at this meeting and explained to the board that redemption of the stock by MKS would violate sec. 180.385(1), Stats.[2] The board voted 3-1 not

---

[2] Section 180.385(1), Stats., provides:

180.385 Right of corporation to acquire and dispose of its own shares.

(1) Unless otherwise provided in the articles of incorporation, a corporation shall have the right to purchase, take, receive, or otherwise acquire, hold, own, pledge, transfer, or otherwise dispose of its own shares; provided that no such acquisition, directly or indirectly, of its own shares for a consideration other than its own shares of equal or subordinate rank shall be made unless all of the following conditions are met:

(a) At the time of such acquisition the corporation is not and would not thereby be rendered insolvent;

to purchase the Kramer estate's shares. Neimark, of course, cast the losing vote.

On November 30, 1978, Neimark commenced an action for specific performance of the 1976 agreement and alternatively, sought monetary damages. The first claim was derivative on behalf of MKS, pursuant to sec. 180.405, Stats; the second claim was personal.

Subsequently, a third party offered to purchase the business for $1,000,000. Neimark conditioned his approval of the sale on the requirement that Delores Kramer and the Kramer estate receive proceeds equal only to the redemption price of the shares which was substantially less than the tendered per-share price. The defendants counterclaimed in Neimark's action and sought an order declaring that Neimark was entitled to receive only his ratable share of the proceeds of any sale of the business, which denied him the redemption agreement benefits. The trial court dismissed Neimark's personal claim, but ordered specific performance of the stock redemption agreement under the derivative claim. The counterclaim was dismissed.

Defendants present three issues for our consideration:

(1) did the failure to perform the stock redemption agreement cause injury to the corporation sufficient to provide a basis for the shareholder's derivative claim;

---

(b) The net assets of the corporation remaining after such acquisition would be not less than the aggregate preferential amount payable in the event of voluntary liquidation to the holders of shares having preferential rights to the assets of the corporation in the event of liquidation; and

(c) 1. Such acquisition is authorized by the articles of incorporation or by the affirmative vote or the written consent of the holders of at least a majority of the outstanding shares of the same class and of each class entitled to equal or prior rank in the distribution of assets in the event of voluntary liquidation; or

2. Such acquisition is authorized by the board of directors and the corporation has unreserved and unrestricted earned surplus equal to the cost of such shares. . . .

(2) did the trial court correctly conclude that MKS could lawfully redeem the estate's shares under secs. 180.385(1), 180.02(11), and 180.02(14), Stats; and

(3) would specific performance of the redemption agreement be inequitable?

## I. INJURY OR WRONG TO MKS

A fundamental requirement of a stockholder's derivative action is an injury or wrong to the corporation. *Shelstad v. Cook*, 77 Wis. 2d 547, 553, 253 N.W.2d 517, 521 (1977) ; *Rose v. Schantz*, 56 Wis.2d 222, 229, 201 N.W.2d 593, 598 (1972). In the context of this case, we view the existence of injury or wrong to MKS as a question of mixed fact and law. The trial court found that the failure of MKS to perform its agreement to redeem the Mel Kramer stock constituted an injury to MKS, because such conduct neglected to take advantage of a $50,000 credit upon the purchase price of the stock, and hazarded the prospect of acquisition of the stock by outsiders. We observe that such omission also sacrificed the utilization of the financial advantage to MKS of acquisition of the stock over a five-year period at a low interest rate.

The trial court's findings are basically grounded upon the terms of the stock redemption agreement. Since that evidence is undisputed and not in conflict with other evidence, we need not accord special deference to those findings. Nonetheless, we are in complete agreement with the trial court's conclusion that failure to perform the agreement resulted in economic injury to the corporation.[3]

---

[3] Appellants contend in their reply brief that the matters for our determination present questions of law "[w]ith but one ex-

## II.   LAWFULNESS OF REDEMPTION,
SECS. 180.385(1) and 180.02(11) and (14), STATS.

Section 180.385(1), Stats., prohibits, *inter alia,* acquisition by a corporation of its own stock if the corporation would thereby be rendered insolvent. "Insolvent" is defined in sec. 180.02(14) as the "inability of a corporation to pay its debts as they become due in the usual course of its business." The purpose of prohibiting own stock acquisition by a corporation if it would thereby be rendered insolvent is to protect the creditors, preferred security holders,[4] and in some cases, common stockholders whose stock is not acquired, from director action which would strip funds from the corporation and create a distributive preference to the stockholder whose stock is acquired.

In the context of this case, we view the question of whether MKS would be rendered insolvent by performance of the stock redemption agreement as a mixed question of law and fact. To the extent that the evidence with respect to factual matters is in conflict, we defer to the factual determination by the trial court unless we find it contrary to the great weight and clear preponderance of the evidence. *Zapuchlak v. Hucal,* 82 Wis.2d 184, 192, 262 N.W.2d 514, 518 (1978).

The trial court's finding of fact, that performance of the stock redemption agreement would not render the corporation insolvent, is supported by ample evidence, and is not contrary to the great weight and clear pre-

---

ception," and refer us to Part 1(c) of that brief. In Part 1(c), appellants contend that the trial court committed an error of law.

[4] There are no holders of preferred security interests in MKS.

ponderance of the evidence. The evidence establishes the fact that the corporation had the ability to pay its debts as they became due. In arriving at that conclusion, the trial court is not restricted to analyzing the cash and cash-equivalent assets of the corporation. The flow of cash to maintain solvency can be generated by a multitude of means other than cash generated solely from sales.

In this case, MKS had a $275,000 line of credit with a local bank. Its annual financial statements for 1976, 1977, and 1978, and the May 31, 1979, financial statement, disclose no inability of MKS to pay its debts as they became due if the redemption agreement had been performed.

Upon Kramer's death, it became the obligation of MKS to redeem his stock, provided the corporation could comply with sec. 180.385(1), Stats., with respect to solvency. We agree with the trial court's finding of fact that it could. To the extent that the finding also constitutes a conclusion of law, we also agree.

Contrary to the English rule, American courts at common law generally permit a corporation to acquire its own shares.[5] The American rule has undergone harsh criticism because of the opportunity it affords to prefer

[5] The cases constituting the American majority rules we have referred to and applied are collected and analyzed in several scholarly and exhaustive treatments of the subject: Hartmann and Wilson, *Payment For Repurchased Shares Under The Texas Business Corporation Act*, 26 Sw. L. J. 725 (1972); Herwitz, *Installment Repurchase of Stock: Surplus Limitations*, 79 Harv. L. Rev. 303 (1965); Kessler, *Share Repurchases Under Modern Corporation Laws*, 28 Fordham L. Rev. 637 (1959–60); Kummert, *The Financial Provisions of the New Washington Business Corporation Act, Part III*, 43 Wash. L. Rev. 337 (1967–68).

selected stockholder/sellers and strip funds from the corporation to the disadvantage of preferred security interest holders, other common stockholders, and creditors. The rule sought protection for those persons by vaguely requiring that the purchase be "without prejudice" to their interests. *Steven v. Hale-Haas Corp.*, 249 Wis. 205, 231, 23 N.W.2d 620, 632 (1946) ; *Koeppler v. Crocker Chair Co.*, 200 Wis. 476, 480–81, 228 N.W. 130, 132 (1930). Additional statutory restrictions resulted and culminated in the two major restraints (for the purposes of this case) : the purchase must be made out of earned surplus and cannot be made if insolvency, in the equity sense, is present or would result. "[I]nsolvency in the equity sense has always meant an inability of the debtor to pay his debts as they mature. Under the Bankruptcy Act it means an insufficiency of assets at a fair valuation to pay the debts." *Finn v. Meighan*, 325 U.S. 300, 303 (1945). The surplus and insolvency tests were incorporated in §6 of the Model Business Corporation Act which formed the basis of the revision of the Wisconsin Business Corporation Law in the early 1950's. Section 180.385, Stats., adopts surplus and insolvency tests. Purchase of shares is permitted if: "At the time of such acquisition the corporation is not and would not thereby be rendered insolvent." Sec. 180.385(1)(a), Stats.

The self-evident applicability of the insolvency test at the time of acquisition of the stock is not equally self-evident in the case of an installment purchase. Considerations of "corporate flexibility" in the acquisition of its stock for legitimate purposes, balanced by "protection for creditors," led the majority of American courts to apply the insolvency test contemporaneously with each installment payment. The Model Business Corporation Act §6 has been amended to specifically so provide. Although that specific change has not been incorporated in sec.

180.385 (1) (a), Stats., we agree with the reasoning of the majority of American courts that the protection of the corporation's creditors requires that the insolvency limitation be applied both at the time of purchase and when each installment payment is made pursuant to the purchase agreement. When the payment is actually made, the assets leave the corporation and concomitantly the lo.. of financial protection occurs. If insolvency results or would result, the purchase may constitute a fraudulent conveyance. In any event, the hazard of fraud to creditors is too great to permit the insolvency test to be applied at times remote to payment for the share repurchase.

Section 180.385 (1) (a), Stats., recognized the problem inherent in the single application of the insolvency test and achieved flexibility by prohibiting a purchase resulting in a corporation that "is" insolvent or "would . . . be" rendered insolvent. Thus, flexibility is achieved by the statute in its application of the insolvency test to each purchase payment.

When applying the insolvency test at the stage of each payment for a stock repurchase to achieve creditor protection, consistency suggests that the amount of each payment, not the total purchase price, should be a component of the determination of solvency. The weight of authority has so applied the tests and we adopt that method of application. That method is in accord with the equity sense insolvency test expressly prescribed by secs. 180.02 (11) and 180.385 (1) (a), Stats.

Defendants have not demonstrated insolvency in the equity sense to the trial court or to us. Our review of the corporate financial statements in evidence discloses no arguable claim of insolvency in the equity sense. The only claim of MKS's insolvency made by defendants is premised upon a deduction of the total stock redemption

purchase price from the corporate assets, thereby creating a balance sheet negative net worth, although the installment payments of the purchase price are spread over five years. We reject the argument because it applies a bankruptcy rather than equity insolvency test, and is contrary to secs. 180.02(11) and 180.385(1)(a), Stats.[6]

The second limitation upon the corporate repurchase of its stock pertinent to this case is the restriction that "the corporation has unreserved and unrestricted earned surplus equal to the cost of such shares." Sec. 180.385 (1)(c)2., Stats.[7] In this respect, the Wisconsin Business Corporation Law generally follows its paradigm, the Model Business Corporation Act. Earned surplus is defined in sec. 180.02(11).[8] In this case, the parties do not dispute the amount of earned surplus.

Our review of the record again establishes the following undisputed evidence with respect to paid-up capital stock, retained earnings, and total stockholders' equity.

| | 12/31 1976 | 12/31 1977 | 12/31 1978 | 5/31 1979 |
|---|---|---|---|---|
| Paid-up Capital Stock | 69,400 | 69,400 | 69,400 | 69,400 |
| Retained Earnings | 246,409 | 276,073 | 317,586 | 317,584 |
| Current Earnings | | | | 31,575 |
| Stockholders' Equity | 315,809 | 345,473 | 386,986 | 418,559 |

[6] The modernized corporation statutes of Maryland, North Carolina, and Texas apply a bankruptcy insolvency test in addition to an equity insolvency test.

[7] We have assumed the applicability of this section because the corporation executed the agreement and this action seeks to compel the board of directors to perform the agreement. The agreement itself applies a corporate surplus test.

[8] For the purpose of this case, earned surplus can be considered to be the retained earnings of the corporation.

We subtract projected payments pursuant to the stock redemption agreement.

| | | | |
|---|---|---|---|
| Retained and Current Earnings Adjusted to Reflect Deducted Installment Payments | 276,073 | 217,586 | 205,961 |
| Installment Payments Without Interest[9] | 100,000 | 43,200 | 53,700 |
| Net Retained Earnings | 176,073 | 174,386 | 152,261 |
| Credit | 50,000 | | |

Historically, the statutory insolvency cutoff test evolved from the "no prejudice to creditors" rule. Dissatisfaction with the limited effectiveness of that test resulted in the formulation of the surplus cutoff test to be applied in conjunction with the insolvency cutoff test.

The same problem arose with the application of the surplus cutoff test that developed in applying the insolvency cutoff test: in the case of an installment purchase, should the surplus test be applied at the time of purchase or at the time cash payment is made? Most cases demonstrate little effort to distinguish between the methods of applying both tests and resolve the question by the easier and more convenient method of applying both tests in the same fashion.

For example, the effect of the Fourth Circuit Court of Appeals' holding in *Mountain State Steel Foundries, Inc. v. Commissioner*, 284 F2d 737 (1960), was to treat an installment repurchase transaction as if each successive installment constituted an independent purchase transaction by applying the surplus test at the time of each payment. *In re Matthews Construction Co.*, 120 F. Supp. 818 (S.D. Cal. 1954), also involved application

---

[9] We have not calculated interest on the unpaid balances because it does not significantly affect the determination of insolvency.

of the surplus cutoff test and like *Mountain State,* indiscriminately applied the reasoning found in *Robinson v. Wangemann,* 75 F.2d 756 (5th Cir. 1935), that a contract of sale was executory until each payment was made in cash, and therefore applied the surplus cutoff test to each installment payment.

Professor Herwitz discusses a number of reasons for applying the surplus to the time of purchase rather than at each installment payment.[10] We agree with his view that the statutory surplus cutoff rule should be applied only once, and at the time of purchase, for the following reasons:

(1) unlike the equity insolvency test, a surplus test does not center upon current liabilities;

(2) unlike the application of the insolvency test, the surplus test is analogous to a purchase for cash and a loan of the unpaid cash price back to the corporation;

(3) installment application of the surplus test could bar performance of a valid obligation of the corporation to the selling stockholder but permit the corporation to disburse funds to current stockholders;

(4) the statutory requirement that surplus be restricted by such a purchase agreement could be frustrated by a construction that would require restriction only on an installment-by-installment basis and permit distributions to shareholders even though the surplus was insufficient to consummate the purchase agreement;

(5) in the manner described in (4), a limited amount of surplus could be used to justify the purchase of an unlimited amount of stock;

(6) when applied to installment payments, the surplus test could be continued indefinitely with current stockholders receiving distributions, putting the selling stockholder in limbo without the status of either creditor or stockholder;

(7) if a default in an installment is compelled by the surplus test, the selling stockholder could possibly obtain

---

[10] *See* note 5, supra.

a windfall return of all of stock, including the part for which payment had already been made;

(8) a creditor with knowledge of the purchase agreement could be unprotected by installment application of the statutory surplus test limitation, *Atlanta & Walworth Butter & Cheese Ass'n v. Smith,* 141 Wis. 377, 123 N.W. 106 (1909);

(9) if interest has been deducted in computing corporate net income, application of the surplus test upon an installment basis to the interest on the purchase price is unsupportable because it would take interest into account twice;

(10) the unpaid selling stockholder is given no consideration, at least to the extent of undistributed surplus, over the other stockholders who are the beneficiaries of the stock purchase; and

(11) the application of the surplus cutoff test at the outset of an installment purchase would in no way hamper or alter the installment application of the equity insolvency test.

We consider it a futile exercise to attempt to ground our decision upon the subtleties and nuances of semantic lexicography in defining "purchase," "acquisition," and the other acquisitory words of transfer used in the statute. The above reasons persuade us that the application of the surplus cutoff test is required to be timed to the purchase rather than the payment of cash. Such a construction comports with the need for corporate flexibility in acquiring its own stock for legitimate purposes and the protection of creditors and holders of other securities of the corporation.

The Minnesota and Texas Supreme Courts, and the Ninth Circuit Court of Appeals, have taken similar views in *Tracy v. Perkins-Tracy Printing Co.,* 278 Minn. 159, 153 N.W.2d 241 (1967); *Williams v. Nevelow,* 513 S.W.2d 535 (Tex. 1974); and *Walsh v. Paterna,* 537

F.2d 329 (9th Cir. 1976). Although differing state statutory formulations were involved, like Wisconsin's, the statutes do not specifically resolve the issues presented there or here.

Although it is apparent from the MKS financial statements that application of the surplus cutoff test upon an installment basis would not have precluded specific performance as ordered by the trial court, application of the test at the outset will preclude specific performance upon the basis of the facts as presented to us. However, we note that the stock redemption agreement provides:

(f) *Insufficient Corporate Surplus.* If the Corporation does not have sufficient surplus or retained earnings to permit it to lawfully purchase all of such shares, each of the parties shall promptly take such measures as are required to reduce the capital of the Corporation or to take such other steps as may be necessary in order to enable the Corporation to lawfully purchase and pay for the Decedent's shares.

We vacate the judgment of the circuit court and remand for further proceedings consistent with this opinion. The circuit court is directed to apply the surplus cutoff test to the time of specific performance of the stock redemption agreement if it concludes that the evidence justifies specific performance. Because we adopt an application of the statute which has not heretofore been explicated, we think it fair to permit the parties to offer current financial data with respect to MKS and the ability of the parties to the redemption agreement to take the necessary steps to enable the corporation to lawfully purchase and pay for the redeemed stock. Such evidence will enable a current evaluation of the propriety of specific performance. In the event the trial court deems specific performance appropriate, it shall make the necessary findings and requirements with regard to providing sufficient earned surplus and assuring solvency as a condition to specific performance.

We reject the defendants' claim of applicability of the business judgment rule[11] to the facts of this case. That rule accords judicial deference to a business judgment but is generally applicable to acquisition of a corporation's own stock where the board of directors has authorized the acquisition without approval of the stockholders, unlike the present circumstance where all of the stockholders consented and bound themselves to the stock redemption agreement.

### III.  ALLEGED INEQUITY OF SPECIFIC PERFORMANCE OF THE REDEMPTION AGREEMENT

Defendant Delores Kramer claims that enforcement of the stock redemption agreement would be inequitable. We disagree. The requirement of adequate surplus at purchase will provide a restricted surplus account to the extent of the unpaid balance of the purchase price. It is true that she becomes a creditor of the corporation and is subject to the hazard of a business failure. She also received the benefit of a compelled market for her stock, had she *desired* to liquidate her interest in MKS. Her predecessor owner executed the agreement which expressly provided for specific performance. The transaction by its terms made the seller a creditor of the business. Obviously Mel Kramer thought the agreement fairly balanced the corporate obligation to acquire the stock with the owner's opportunity to liquidate an investment in a corporation whose majority stockholder and principal officer had died.

*By the Court.*—Judgment vacated and cause remanded for further proceedings consistent with this opinion.

[11] *See, e.g., Steven v. Hale-Haas Corp., supra,* 249 Wis. at 221, 23 N.W.2d at 628.