**In re NORTHWEST OXYGEN, INC., Debtor.**

**Bankruptcy No. B–88–00842 C–11.**

United States Bankruptcy Court, M.D. North Carolina.

April 26, 1989.

Gene B. Tarr, Winston–Salem, N.C., for debtor.

Walter W. Pitt, Winston–Salem, N.C., for movant.

Rayford K. Adams III, Greensboro, N.C., for Unsecured Creditors' Committee.

## MEMORANDUM OPINION

JERRY G. TART, Bankruptcy Judge.

THIS MATTER coming on for hearing and being heard before the undersigned Bankruptcy Judge presiding on March 9, 1989, upon the motion of Richard D. Hancock for order prohibiting or conditioning the debtor's use of cash collateral; and it appearing that Gene B. Tarr, counsel for the debtor in possession (hereinafter "debtor"), Walter W. Pitt, counsel for the movant, and Rayford K. Adams III, counsel for the Unsecured Creditors' Committee, appeared at the hearing, and it further appearing that the Court having carefully considered the briefs of counsel, the official court file, the evidence presented at trial, the arguments of counsel and having taken the matter under advisement does herewith make its findings of fact and conclusions of law.

### FINDINGS OF FACT

Northwest Oxygen, Inc. (hereinafter "Oxygen") is a corporation organized under the laws of the state of North Carolina. Oxygen had two principal shareholders, Frank H. Wright, Jr. and Richard D. Hancock, the movant herein. Each shareholder owned 500 shares of the capital stock of Oxygen, which shares represented 50% of the issued and outstanding shares of the corporation. These shares were issued to Wright and Hancock on June 12, 1974. The two principal shareholders, Wright and Hancock, served as directors and officers of Oxygen sharing in the responsibility and management of its business.

After enjoying several years of successful operations, disagreement between the

two principal shareholders resulted in Oxygen purchasing from Hancock his 500 shares of capital stock in the corporation. On or about August 31, 1984, Mr. Wright, Mr. Hancock, Mrs. Wright, Northwest Oxygen, Inc., and Cardio–Pulmonary Associates, Inc., a related entity, entered into an agreement for the purchase of the Hancock stock, the transfer or exchange of real estate located in Winston–Salem, North Carolina and Tampa, Florida, and the settlement of other business debts or interests between the parties. This agreement cul- minated in the execution of a promissory note dated September 6, 1984, in the face amount of $1,440,085.50. This amount represents the purchase price for the Hancock stock of $1,300,000.00 less a $50,000 cash payment made at closing plus $190,085.50 representing the balance of certain loans made by Hancock or members of his family to Oxygen. The evidence indicated the sales price was based on a multiple of annual pre-tax earnings and not asset value. This was represented to be an industry standard for distribution type companies. Pursuant to the terms of the promissory note Oxygen was to make monthly payments of $20,661.05 commencing October 6, 1984, for a period of ten years. Oxygen made such monthly payments from October 6, 1984 through February 6, 1988. The stock purchased by Oxygen was transferred on September 6, 1984, by the issuance of Share Certificate No. 3 as Treasury shares. The shares represented by Treasury Share Certificate No. 3 have at all times remained Treasury stock.

The promissory note to Hancock was secured by all assets of Oxygen including equipment, inventory, vehicles, accounts receivable, contract rights, general intangibles, furniture, fixtures, all other personal property, and all replacements, additions, accessions or substitutions of the foregoing. The security interest is evidenced by a collateral security agreement and stock pledge agreement. Hancock perfected the security interest as required by state law by notations of liens and filing financing statements in the proper locations. Hancock, further agreed to subordinate his security interest in accounts receivable, inventory and equipment to a lien in favor of NCNB, Oxygen's primary lending institution.

The promissory note dated December 6, 1984, was modified by a settlement agreement and release dated April 27, 1987. The modifications consisted of a change in the minimum interest rate of the note and the term of the note, a requirement of Oxygen to retain pretax earnings of at least $200,-000.00 for each fiscal year until the note is paid in full, and made a default by Oxygen on any loan to NCNB a default under the security agreement with Hancock.

Oxygen experienced difficulties during the latter part of 1987 which resulted in the filing of an involuntary petition under Chapter 11 of the United States Bankruptcy Code against Northwest Oxygen, Inc. on April 13, 1988. Oxygen answered that petition on May 9, 1988, admitting the material allegations contained in the involuntary petition and showing debts of $8,167,513.73 against assets of $4,998,177.38.

On or about November 23, 1988, Hancock filed this motion for an order prohibiting or conditioning the debtor's use of cash collateral alleging that his security interest by virtue of the promissory note and security agreement executed on September 6, 1984, gives him a perfected security interest in Oxygen's cash collateral entitling him to adequate protection and the ability to request that the Court prohibit or restrict the use of such cash collateral.

## ISSUES

The principal question at hand is whether a promissory note to a former shareholder in exchange for the redemption of his shares in the corporation is rendered unenforceable by the corporation's subsequent insolvency. Second, if the Court determines the promissory note is unenforceable, it must then determine whether the underlying security interest would also be unenforceable thereby destroying any interest in cash collateral the movant might wish to protect.

As a case of first impression in the state of North Carolina, as well as the Bankrupt-

cy Court for the Middle District of North Carolina, the Court must examine any relevant case law as well as statutory law provided in North Carolina General Statute section 55–52 and the equities as they would apply to the case at bar.

### CONCLUSIONS OF LAW

#### 11 U.S.C. Section 363

Hancock makes this motion to prohibit or condition the use of cash collateral pursuant to 11 U.S.C. section 363(e). That section provides:

> (e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interests.

The property which Hancock seeks to prohibit or condition the use of is "cash collateral." "Cash collateral" is defined by 11 U.S.C. section 363(a) to mean "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest...." It is clear from a reading of both section 363(a) and (e) that in order for Hancock to be successful in this motion he must show that he is an entity, other than the estate, which has an interest in this property of the estate. Hancock alleges a security interest in the debtor's cash collateral by virtue of the promissory note and security agreement executed by Oxygen on September 6, 1984, in exchange for the redemption of its stock. Moreover, for Hancock to succeed on his motion to prohibit or condition the debtor's use of its cash collateral, he has the burden of proof on the issue of the validity, priority or extent of such interest. 11 U.S.C. section 363(o)(2).

The debtor, in its response to Hancock's motion, has attacked the validity and extent of the security interest alleged by Hancock by questioning the validity and effect of the September 9, 1984 promissory note and security agreement. Oxygen states that its promissory note to a former shareholder, made in partial payment for the purchase of its stock from the shareholder, is unenforceable after the corporation becomes insolvent. The debtor goes on to state that once the underlying promissory note becomes unenforceable so does the security agreement creating an interest in the property of the debtor. Thus, absent a security interest in property of the debtor the movant would have no cash collateral to protect by order prohibiting or conditioning the use of such cash collateral. In support of its position, the debtor offers N.C.Gen.Stat. section 55–52 as providing the relevant statutory law to render unenforceable the security interest of Hancock.

#### North Carolina Business Corp. Act, N.C.Gen.Stat. section 55–52

The debtor provides evidence to the Court that N.C.Gen.Stat. section 55–52 entitled "Acquisition by a Corporation of Its Own Shares" prohibits a corporation from purchasing or paying for its stock in a transaction such as the one at bar from anything but surplus. N.C.Gen.Stat. section 55–52(b) provides the instances when a corporation may purchase and pay for its shares out of capital. N.C.Gen.Stat. section 55–52(c) provides the instances when a corporation may purchase and pay for its shares, but only out of surplus. Hancock argues that the correct subsection to be applied in the instant case is section 55–52(b)(4) which states that a corporation may purchase and pay for its shares regardless of any impairment to stated capital:

> (4) To perform its obligations or exercise its right to purchase shares of an employee or former employee under a written agreement relating to the employment, or to perform its obligation or exercise its right under a written agreement to purchase shares of a deceased or disabled shareholder upon death or disability, or *to perform its obligations or exercise its rights to purchase shares of a shareholder under any other written agreement to which all shareholders*

*are parties* or if all shareholders are not parties then under such written agreement that has been approved by the majority of the outstanding shares, regardless of limitation on voting rights, other than shares owned by the shareholder who are parties to such agreement. (Emphasis added)

The debtor on the other hand argues that the transaction in question is governed by N.C.Gen.Stat. section 55–52(c)(3), and therefore, any payment made on a note in satisfaction of the stock purchase agreement must be paid out of surplus. Section 55–52(c)(3) provides for a corporation to purchase and pay for its shares, but only out of surplus:

(3) From any shareholder of any class, if the board of directors shall have obtained authorization so to purchase, within a period of one year preceding the purchase, by vote of a majority of the shares of the corporation entitled to vote after full disclosure to the holders of all such shares of the specific purpose of the proposed purchase, together with a statement of the number and class of shares proposed to be purchased. Such vote shall not be required for each specific purchase, provided the total number of shares purchased from any class shall not exceed the maximum number of shares of that class authorized to be purchased.

This Court must agree with the debtor's analysis for two reasons. First, the agreement between Hancock and the debtor was executed in 1984. The provision which Hancock seeks to rely on in section 55–52(b)(4) was an amendment to the original provision of N.C.Gen.Statute section 55–52(b)(4), and became effective April 23, 1985. Therefore, at the time of the agreement N.C.Gen.Stat. section 55–52(c)(3) was the only statutory provision permitting Oxygen's purchase of its stock from Hancock, and that purchase was required by law to come from surplus. No other statutory authority existed for such stock purchase agreement.

■ Second, upon examination of the legislative history and purpose for the 1985

amendment to the statute authorizing acquisition by a corporation of its own shares, it is evident that the amendment to section 55–52(b)(4) was established to enable corporations to enter into written agreements with shareholders at the outset of the relationship for the *issuance* of stock redeemable at the shareholder's option. The statute was not designed to simply allow the corporation to enter into a written agreement with a shareholder to redeem stock out of and as an impairment to stated capital, which stock was already being held by the shareholder as common stock. Legislative History, Exhibit D, p. 9, "Supplemental Brief Supporting Debtor Response to the Motion of Richard D. Hancock for Order Prohibiting or Conditioning Debtor's Use of Cash Collateral" (hereinafter "Supplemental Brief"). The purpose was to provide a new method for North Carolina corporations to raise needed capital by readily available cash infusions from shareholders in exchange for stock redeemable at their request. Lesiglative History, Exhibit F, p. 2, "Supplemental Brief." In this respect, the amendment to section 55–52(b)(4) permitting written agreements was an accommodation for the amendments to section 55–40(e) and section 55–43(e) of the North Carolina Business Corporation Act. It was amended to ensure continuity among the statutes in the Business Corporation Act and to facilitate the amendments authorizing the issuance of shares subject to redemption at designated times or upon the happening of a certain event.

The case at bar in no way resembles a section 55–52(b)(4) transaction. Hancock was the owner of 500 shares of common stock in Oxygen. Hancock and the debtor entered into a written agreement some ten years after issuance of the shares for the sale of the common stock owned by Hancock. This was not a written agreement between the corporation and the shareholder for the issuance of stock redeemable at the shareholder's option pursuant to N.C. Gen.Stat. section 55–52(b)(4) as amended. Therefore, the transaction was authorized by law only under N.C.Gen.Stat. section

55–52(c)(3) and must only be paid out of surplus.

A further restriction on a corporation's ability to acquire its stock is found in subsection (e) of N.C.Gen.Stat. section 55–52. That subsection prohibits the acquisition, if at any time, or as a result of the acquisition there is reasonable ground for believing that the corporation would be unable to meet its obligations as they become due, or the liabilities of the corporation would exceed the fair present value of its assets. Reading N.C.Gen.Stat. section 55–52(c) and (e) together it is clear that in North Carolina a corporation may only purchase and pay for the acquisition of its shares in a transaction such as the one at bar out of surplus.

■ In light of the statutory requirement of N.C.Gen.Stat. section 55–52(c), that the stock may only be purchased and paid for out of surplus, the question now becomes "When is the solvency of the corporation measured in order to determine whether a sufficient surplus exists?" The overwhelming majority of courts addressing this issue have followed the leading case of *In re Fechheimer Fishel Company*, establishing that despite the good faith of the parties at the time the note was given, and the apparent solvency of the corporation at the time the note was given, such note will be rendered unenforceable as against other creditors of the corporation if the corporation was insolvent or lacked sufficient surplus to retire the installment at the time the payment was to be made out of the assets of the corporation. *In re Fechheimer Fishel Company*, 212 F. 357 (2d Cir.1914), *See also, Matter of Flying Mailmen Service, Inc.*, 539 F.2d 866, 869 (2d Cir.1976) (court held that under New York law *installment payments* may not be made to a shareholder for the repurchase of his stock in a situation of insolvency even thought the agreement to repurchase the stock was entered into when the corporation had a surplus sufficient to cover the entire purchase price, and title to the stock had been transferred) (emphasis added); *In re Trimble Company*, 339 F.2d 838, 843 (3d Cir.1964) (court

held that *payment on notes* given by a corporation to shareholders in exchange for repurchased stock were unenforceable after the corporation became insolvent until such time as the assets of the corporation were such that payment would not be in violation of Pennsylvania statutory law requiring a corporation to have unrestricted and unreserved earned surplus from which to pay such notes) (emphasis added); *Mountain State Steel Foundries, Inc. v. C.I.R.*, 284 F.2d 737, 742 (4th Cir.1960) (court held that under West Virginia law a corporation's purchase of a portion of its outstanding stock with an agreement to pay for it at a subsequent time is a promise to pay, provided *at the time of payment* it has sufficient surplus that disbursement of funds will occasion no impairment of capital) (emphasis added); *Robinson v. Wangemann*, 75 F.2d 756, 758 (5th Cir.1935) (court held in a bankruptcy case that it was necessary that the corporation should be solvent and have sufficient surplus to prevent injury to creditors *when the payment is actually made* to the shareholder retiring the stock) (emphasis added); *McConnell v. Estate of Butler*, 402 F.2d 362, 366 (9th Cir.1968) (the court in a bankruptcy context held that with regard to the payment under a stock purchase agreement the crucial time as to creditors who will be prejudiced is the *time when payment would be made*, since that is the time when funds would actually be depleted) (emphasis added); *Matthews Brothers v. Pullen*, 268 F. 827 (1st Cir.1920) (the court held a shareholder was prevented from enforcing the corporation's obligation to pay for its own stock pursuant to a promissory note given by the corporation after the insolvency of the corporation, notwithstanding the good faith of the parties, solvency of the corporation at the time of purchase, and that the purchase did not render the corporation insolvent at the time of the initial transaction). In addition to the circuit court decisions mentioned above, a multitude of district courts, *see e.g., In re Dawson Bros. Construction Co.*, 218 F.Supp. 411 (N.D.N.Y.1963); *Baxter v. Lancer Industries, Inc.*, 213 F.Supp. 92 (E.D.N.Y. 1963) (applying Florida statute); *In re*

*Mathews Construction Co.*, 120 F.Supp. 818 (D.C.Cal.1954); *In re Bell Tone Records*, 86 F.Supp. 806 (D.N.J.1949); *Quinn–Marshall Co. v. McDaniels*, 5 F.Supp. 937 (M.D.N.C.1934); *In re Vulcan Soot Cleaners Co.*, 11 F.Supp. 388 (W.D. Pa.1935) (applying Delaware statute), bankruptcy courts, *see e.g., In re Salem Tool Co.*, 82 B.R. 52 (Bankr.N.D.Ohio 1988); *In re McCulloch & Son, Inc.*, 30 B.R. 7 (Bankr.D.Or.1983), and state courts, *see e.g., Squire v. Rafferty*, 131 Ohio St. 156, 2 N.E.2d 255 (1936); *Neimark v. Mel Kramer Sales, Inc.*, 102 Wis.2d 282, 306 N.W.2d 278 (1981); *Fuller v. Motor & Tire Service Co.*, 190 N.C. 655, 130 S.E. 545 (1925), have relied on and followed the reasoning of *Fechheimer Fishel Company, supra.*

Most of the above-mentioned courts relied on statutes similar to N.C.Gen.Stat. section 55–52(c), however, even in those jurisdictions where corporate statutes do not expressly prevent payment for stock except out of surplus, the courts have nonetheless held that payments must be made out of surplus. The North Carolina statute contains language much more supportive of the debtor's position than many of the statutes relied on by courts espousing the majority view. This Court notes with interest that the North Carolina statute specifically states that a corporation may "purchase *and pay for* its shares...." (emphasis added) The inclusion of the words "and pay for" in the statutory language of N.C.Gen.Stat. section 55–52(c) convinces this Court that a solvency test for surplus must occur each time a corporation makes a "payment" on the indebtedness out of the assets of the corporation. N.C.Gen.Stat. section 55–52(c) sets forth the conditions under which a corporation may acquire its own shares. That statute authorizes the corporation to issue a note in partial payment for the shares acquired by it, similar to the situation in the instant case. However, the statute imposes certain restrictions on the payments made for the shares. One such restriction is that each payment be made from surplus funds. This restriction is incorporated in and made a part of the stock purchase agreement between Oxygen and Hancock, by virtue of the fact that it is contained in the language of the only statutory authority existing at the time of the transaction which allowed such acquisition of stock. This is a condition which the law attaches to the agreement in order for it to have full force and effect. *In re Fechheimer Fishel Company*, 212 F. at 366. *In re Trimble Company*, 339 F.2d at 843, *citing Mountain State Steel Foundries, Inc. v. C.I.R.*, 284 F.2d 737 (4th Cir.1960).

The rationale behind such statutory language is the recognition of the paramount interest of creditors of the corporation as against the interest of a former shareholder who takes a note, a mere promise to pay, in exchange for his shares of stock in the corporation. The promissory note between Hancock and the corporation was executory in nature until paid for in cash. Therefore, although the note may have been valid when entered into, because there existed sufficient surplus under section 55–52(c)(3) and the stock agreement did not render the corporation insolvent under section 55–52(e), the note cannot be enforceable once insolvency occurs. *McConnell v. Estate of W.H. Butler*, 402 F.2d 362, 366 (9th Cir.1968), *citing Robinson v. Wangemann*, 75 F.2d 756 (5th Cir.1935). The note from Oxygen to Hancock thereby remains unenforceable until such time as sufficient surplus exists to retire the indebtedness without prejudicing Oxygen's other creditors.

*Rationale Based in Equity*

There are several reasons why a stock purchase agreement should be treated differently than the issuance of a promissory note and the taking of a security interest by any other creditor. First, as stated above, is the fact that state law requires such transactions to be paid out of surplus, with that surplus being measured at the time payment is made out of the assets of the corporation. N.C.Gen.Stat. section 55–52(c). Second, shareholders have a special relationship with the corporation different from other creditors of the corporation. Thus, they assume the risk when agreeing to accept payment at a subsequent time for the exchange of their stock, that the corpo-

ration will remain solvent and enjoy future profitability from which their debt will be satisfied. This was aptly reasoned in the *In re Fechheimer Fishel Company* case wherein the court stated that a stockholder who accepts a note for the redemption of his stock "sells at his peril and assumes the risk of consummation of the transaction without encroachment upon the funds which belong to the corporation in trust for the payment of its creditors." *In re Fechheimer Fishel Company,* 212 F. at 363. This special relationship of the shareholder to the corporation was further addressed in the case of *In re Salem Tool Company,* 82 B.R. 52 (Bankr.N.D.Ohio 1988). Here the court stated that a shareholder may not change his relationship from that of a shareholder to that of a creditor in the face of insolvency of the corporation by entering a stock purchase agreement and taking a note from the corporation. *In re Salem Tool Co.,* 82 B.R. at 54, *citing, Squire v. Rafferty,* 131 Ohio St. 156, 2 N.E.2d 255–59 (1936).

The third reason former shareholders are treated differently from other creditors regarding a stock purchase transaction is that a transfer of the shareholder's shares of stock back to the corporation as Treasury shares is really not a sale. This is true because the corporation does not acquire anything of value in exchange for the depletion of its assets each time a payment is made, while the stock is held by the corporation as Treasury stock. Rather, it is merely held by the corporation while distribution to the shareholder of corporate assets is made. *Robinson v. Wangemann,* 75 F.2d at 757. Such are the facts in the instant case. Upon the purchase of its stock, Oxygen held the 500 shares previously owned by Hancock as Treasury shares and those shares remain Treasury shares today.

██ Since the underlying promissory note is rendered unenforceable by the debtor's subsequent insolvency, so, too, is the security agreement. Thus, Hancock does not have an enforceable security interest from which the protection of cash collateral can be demanded by this motion. Hancock has no present interest in cash collateral of the debtor and, therefore, his motion to prohibit or condition the use of debtor's cash collateral is denied.

*Conclusion*

The holding of this Court may appear harsh at first blush. However, any hardship imposed upon Hancock by rendering the note and underlying security agreement unenforceable by reason of subsequent insolvency of the debtor does not outweigh the overwhelming majority of courts approving such result in the interest of intervening creditors. The debtor's intervening insolvency will prevent enforcement of the stock purchase agreement when it will be prejudicial to creditors. This Court must now look to the paramount interest of creditors of the estate and protect those interests. For the reasons mentioned above, this Court holds that the note and security agreement of Richard D. Hancock is unenforceable due to the debtor's subsequent insolvency and inability to make payment on the obligation out of sufficient surplus of corporate assets. Hancock assumed the risk when he took a note in exchange for his shares of stock in the corporation. Hancock had alternatives to accepting a note for payment at a subsequent time. He could have demanded cash payment of the fair value of the stock at the time of the transaction. Instead, he accepted a *diminimus* fraction of the purchase price in cash and a promise to pay in the future for the balance. By accepting that promise to pay Hancock committed himself to reliance on the future success and profitability of the corporation and bound the payment on his note to surplus earnings.